IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2016 Term

**FILED**
**February 11, 2016**
released at 3:00 p.m.
RORY L. PERRY, II CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 15-0451

IN RE: C.M., D.M., AND E.M.

Appeal from the Circuit Court of Wood County
Honorable Jeffrey B. Reed, Judge
Civil Action Nos. 14-JA-60, 14-JA-61, 14-JA-62

REVERSED AND REMANDED
WITH DIRECTIONS

Submitted: January 13, 2016
Filed: February 11, 2016

Courtney L. Ahlborn, Esq.
Parkersburg, West Virginia
Attorney for Petitioner Mother

Rhonda L. Harsh, Esq.
Parkersburg, West Virginia
Guardian ad Litem for
infant children

Charles R. "Rusty" Webb, Esq.
Charleston, West Virginia
Attorney for Respondent Father

Patrick Morrisey, Esq.
Attorney General
Charleston, West Virginia
Lee Niezgoda, Esq.
Assistant Attorney General
Fairmont, West Virginia
Attorneys for Respondent
West Virginia Department of
Health and Human Resources

JUSTICE LOUGHRY delivered the Opinion of the Court.

SYLLABUS BY THE COURT

1. "'Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety.' Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996)." Syl. Pt. 1, *In re Cecil T.*, 228 W.Va. 89, 717 S.E.2d 873 (2011).

2. "'Although parents have substantial rights that must be protected, the primary goal in cases involving abuse and neglect, as in all family law matters, must be the health and welfare of the children.' Syl. Pt. 3, *In re Katie S.*, 198 W.Va. 79, 479 S.E.2d 589 (1996)." Syl. Pt. 2, *In re F.S.*, 233 W.Va. 538, 759 S.E.2d 769 (2014).

i

3. "'''''W.Va. Code, 49-6-2(c) [1980], requires the State Department of Welfare [now the Department of Health and Human Resources], in a child abuse or neglect case, to prove 'conditions existing at the time of the filing of the petition . . . by clear and convincing proof.' The statute, however, does not specify any particular manner or mode of testimony or evidence by which the State Department of Welfare is obligated to meet this burden." Syllabus Point 1, *In Interest of S.C.*, 168 W.Va. 366, 284 S.E.2d 867 (1981).' Syllabus Point 1, *West Virginia Department of Human Services v. Peggy F.*, 184 W.Va. 60, 399 S.E.2d 460 (1990)." Syllabus Point 1, *In re Beth*, 192 W.Va. 656, 453 S.E.2d 639 (1994).' Syl. Pt. 3, *In re Christina L.*, 194 W.Va. 446, 460 S.E.2d 692 (1995)." Syl. Pt. 3, *In re F.S.*, 233 W.Va. 538, 759 S.E.2d 769 (2014).

4. "In cases involving the abuse and neglect of children, when it appears from this Court's review of the record on appeal that the health and welfare of a child may be at risk as a result of the child's custodial placement, regardless of whether that placement is an issue raised in the appeal, this Court will take such action as it deems appropriate and necessary to protect that child." Syl. Pt. 6, *In re Timber M.*, 231 W.Va. 44, 743 S.E.2d 352 (2013).

5. "'To facilitate the prompt, fair and thorough resolution of abuse and neglect actions, if, in the course of a child abuse and/or neglect proceeding, a circuit court discerns

from the evidence or allegations presented that reasonable cause exists to believe that additional abuse or neglect has occurred or is imminent which is not encompassed by the allegations contained in the Department of Health and Human Resource's petition, then pursuant to Rule 19 of the *Rules of Procedure for Child Abuse and Neglect Proceedings* [1997] the circuit court has the inherent authority to compel the Department to amend its petition to encompass the evidence or allegations.' Syl. Pt. 5, *In re Randy H.*, 220 W.Va. 122, 640 S.E.2d 185 (2006)." Syl. Pt. 10, *In re T.W.*, 230 W.Va. 172, 737 S.E.2d 69 (2012).

LOUGHRY, Justice:

This is an appeal initiated by S.M. (hereinafter "the petitioner mother" or "the mother") from the April 17, 2015, order of the Circuit Court of Wood County through which the court dismissed a petition for abuse and neglect filed against the respondent father.[1] The circuit court concluded that the West Virginia Department of Health and Human Resources ("DHHR" or "West Virginia DHHR") failed to meet its burden of proving by clear and convincing evidence that the respondent father was abusive. After a thorough review of the appendix record, the written and oral arguments of counsel, and the applicable precedent, this Court concludes that the circuit court committed clear error. Accordingly, we reverse and remand this case for further proceedings consistent with this opinion.

## I. Factual and Procedural Background

The petitioner mother and the respondent father are the parents of a daughter, C.M., who was born in April of 2006, and a son, D.M.,[2] who was born in October of 2004. The parents were divorced in West Virginia in 2009 and the petitioner mother moved to

---

[1]Because this case involves children and sensitive matters, we follow our practice of using initials to refer to the children and their parents. *See* W.Va. R. App. P. 40(e); *State v. Edward Charles L.*, 183 W.Va. 641, 645 n. 1, 398 S.E.2d 123, 127 n. 1 (1990). In this matter, both the respondent father and his minor daughter have the same initials. This opinion will refer to the father as "the respondent father" and to the child as "C.M."

[2]D.M. was incorrectly denominated as C.M., Jr. in the underlying abuse and neglect petition and in the circuit court's April 17, 2015, order. The style of this case has been modified to include his correct initials.

North Carolina. Pursuant to an agreed parenting plan order, the children primarily resided with the respondent father in West Virginia, visiting their mother in North Carolina during their summer recesses from school and on certain holidays.[3] The respondent father's girlfriend, T.T., and their infant child together, E.M., also lived in the father's home.[4]

The petitioner mother testified that during the children's visit to her home in the summer of 2013, C.M. disclosed that the respondent father made her watch sexually explicit videos. The petitioner mother says that when the children next visited her at Christmas of 2013, C.M. again revealed that her father forced her to watch inappropriate videos. In late December of 2013, the petitioner mother reported this information to the West Virginia DHHR. Pursuant to the terms of the parenting plan, the children returned to the respondent father's home in West Virginia at the end of their Christmas break.

On February 6, 2014, Pamela Hendrickson, a Child Protective Services ("CPS") Worker with the West Virginia DHHR, went to the children's elementary school and

---

[3]When the abuse and neglect petition was filed, C.M. and D.M. were removed from the respondent father's home and placed with the petitioner mother full time. That placement has remained in effect pending the outcome of this appeal.

[4]Although there are no allegations that anyone abused E.M., he is also a subject of this abuse and neglect case because he was living in the respondent father's home. *See* W.Va. Code § 49-1-3(1)(A) (2012) (now codified at W.Va. Code § 49-1-201 (2015)) (defining "abused child" to include another child in the home). T.T. was a party respondent in the underlying abuse and neglect case but has not participated in this appeal.

spoke separately with seven-year-old C.M. and nine-year-old D.M. Ms. Hendrickson did not make an audio or video recording of these interviews. According to Ms. Hendrickson's testimony, the children told her that their father showed them sexually explicit movies in the living room of their home; that these movies were on DVDs and were stored in "boxes with numbers after them"; and that their father and C.M. had "special time" together when D.M. was made to leave the room. C.M. explained that the adults shown in the movies had their clothes off, and C.M. was able to accurately describe oral sex. C.M. also reported that her father made her remove her clothes, but she did not tell Ms. Hendrickson whether anything happened after she removed her clothes. Furthermore, both children told her that they watched their father, his live-in girlfriend T.T., and two other adults having sex. C.M. indicated to Ms. Hendrickson that she was afraid her father would hurt her if she told anyone. D.M. also expressed fear of what would happen if his father learned that he had disclosed these things.

Ms. Hendrickson left the school and went directly to the home of the respondent father and T.T. According to Ms. Hendrickson, the respondent father and T.T. were cooperative and visibly upset by the allegations. The respondent father denied showing the children sexually explicit videos. Ms. Hendrickson was permitted to look around the house, but she left the respondent father alone in the living room while she and T.T. went upstairs. Although she declined to look into drawers that were opened by T.T., Ms.

3

Hendrickson looked at the titles of the DVDs she observed in the home and she reviewed the family's Netflix viewing history. Ms. Hendrickson did not find any sexually explicit videos.

Upon learning that the children had password-protected iPods, Ms. Hendrickson returned to the school that same day to unlock the iPods given to her by the respondent father. The children were called into the principal's office to meet with Ms. Hendrickson again; these interviews were not recorded. Ms. Hendrickson testified that when she spoke with C.M. and D.M. on this second occasion, they recanted the reports they had made earlier in the day. According to Ms. Hendrickson, C.M. said she could not recall any abuse by her father; over Christmas break her mother had continually asked questions about whether the respondent father had touched her; and the information she reported earlier in the day is what her mother had told her to say. Ultimately, Ms. Hendrickson and her supervisor concluded that abuse could not be substantiated, so they closed the case.

The petitioner mother testified that after the children arrived in North Carolina for the summer of 2014, the now-eight-year-old C.M. again revealed that her father had made her watch a movie with sexually explicit content. According to the petitioner mother, C.M. also made a new disclosure: after watching the movie, the respondent father removed his clothes, made C.M. remove her clothes, and he then touched his "private part" to her "private

4

part."[5]  In addition, C.M. reported itching on her bottom.  The petitioner mother took C.M. to a hospital emergency room in North Carolina, where C.M. was treated for a vaginal yeast infection.  The petitioner mother also testified that an adult family member had previously observed C.M. and a young female cousin playing a "mommy/daddy game" where one child was lying on top of the other and they were kissing. A referral was made to the North Carolina Division of Social Services.

On July 10, 2014, C.M. was interviewed by Elizabeth Pogroszewski, a forensic interviewer employed by a Child Advocacy Center in North Carolina.  This interview was video recorded.  C.M. again revealed that her father showed her a "dirty" movie while they were in the living room of their house.  When asked about the movie, C.M. said it involved "s-e-x," spelling out the word, and that a woman without clothes was moving up and down on a man without clothes.  C.M. said the man in the movie also put his "privates" in the woman's mouth.  According to Ms. Pogroszewski, C.M. gave clear details about the contents of the movie and where C.M. was located–the living room of her father's home–when watching the movie.

---

[5]The record is unclear whether C.M. first reported molestation to her mother or her maternal grandmother, who lives next door to the mother's home.

During the recorded interview, C.M. also described for Ms. Pogroszewski an occasion when her father placed his "privates" on and in C.M.'s "privates," which she said felt "weird" and hurt a little. The interviewer confirmed that C.M. was referring to her and her father's genitalia, and C.M. drew three stick figure sketches of her and her father naked together in the living room. One drawing depicts the respondent father, with an erect penis, kneeling beside her. C.M. explained that this occurred in the living room of their home after watching the "s-e-x" movie. C.M. said that she and her father put their clothes back on when they heard T.T. and D.M. coming into the home from outside.

Following the interview, C.M. underwent a physical examination by Jennifer Benton, a nurse practitioner and pediatric sexual assault nurse examiner at the same Child Advocacy Center in North Carolina. During the examination, C.M. clarified that her father had put his "private" on and in her "private" "more than one time" during the incident she described in the living room. The examination revealed that C.M. had a hymenal opening that was larger and thinner than one would expect to see in a child of her age, and she had a notch and a mound on her hymenal ring. Ms. Benton explained that while these are not expected findings, they could constitute normal variances in the child's anatomy and therefore are not determinative of sexual abuse. She added, however, that these physical findings are suspicious when accompanied by a disclosure of sexual abuse.

6

After receiving the information set forth above from the North Carolina Child Advocacy Center, the West Virginia DHHR reopened its case and filed a petition in the circuit court alleging abuse and neglect. During the adjudicatory hearing, C.M. testified that while they were in their living room, her father showed her a DVD of a "dirty" movie with "s-e-x" where the "boy would go on top of the girl . . . going up and down" and the people in the movie were not wearing clothes. However, she also recalled that there were "children . . . playing upstairs" in the movie. C.M. explained that her father then removed his pants, had her drop her pants to down around her ankles with her shoes still on, and he touched his "private" to her "private." C.M. said that her father's "private" went inside her and it felt "weird." She further testified that while this was going on, her father moved his "private" back and forth. C.M. added that when she and her father heard T.T. and D.M. on the porch about to enter the house, they put their clothes on and her father threatened, "don't tell anybody or I'll give you a butt whipping." At the adjudicatory hearing, she testified that this only happened one time. C.M. denied that her mother told her to say these, or any bad things, about her father. She testified that her mother had only told her to tell the truth.

C.M. testified that D.M. had been in the living room watching the movie with them, but once the movie was over, their father told D.M. to go outside. In his testimony at the adjudicatory hearing, ten-year-old D.M. confirmed that the respondent father showed him and C.M. adult movies on DVDs where a man and a woman who were not wearing clothes

were in bed together.  However, he recalled that his father showed them these movies when D.M. was younger, "probably four or five" years old or "in the first grade."  Although D.M. recalled seeing the adult movies on multiple occasions, at the adjudicatory hearing C.M. testified to only one occurrence.  D.M. stated that nobody told him to lie or directed him to give this testimony.

During the adjudicatory hearing, the circuit court inquired of the forensic interviewer, Ms. Pogroszewski, whether there was any indication that C.M. had been coached to make false allegations.  She explained that children, especially younger children, have a hard time providing details if they are talking about something in which they did not actually participate.  Also, if one parent coached the child with derogatory information about the other parent, the child might exhibit a change in demeanor when talking about one parent versus the other parent.  Ms. Pogroszewski testified that C.M. gave details in response to focused questions, and exhibited no change in demeanor, when discussing the one incident in the living room:

> I felt like, even though, again, she was not extremely narrative, she did give me very clear details when I asked more focused questions, such as, what it felt like, and where she was, and the position, you know, that she was in. I did not feel like there was a change in her demeanor at all whether she was talking about dad or mom, meaning I didn't feel like there was a strong allegiance versus one parent over the other parent, and her demeanor just kind of remained the same during the entire interview.  And I thought she was able to provide very clear, concise details.

8

The respondent father testified at the adjudicatory hearing and denied all of the allegations. He challenged the credibility of the children's testimony by arguing that there were inconsistencies in the evidence, including differences in C.M.'s various reports about the frequency of the alleged misconduct. His lawyer also argued that C.M. would have suffered serious physical injury had the respondent penetrated her. In addition, two teachers, the school counselor, and the principal from the children's school in West Virginia testified that C.M. and D.M. never disclosed abuse or exhibited signs of abuse. Dr. David Clayman, a psychologist retained by the respondent to review the file in this matter, raised concerns about the process used in the investigation. He testified that because the children were questioned multiple times, it is now difficult to determine whether parts of their statements come from information outside of their own recollections. This is complicated by CPS Worker Hendrickson's failure to record her interviews. Dr. Clayman was also concerned that Ms. Pogroszewski's use of the word "okay" after some of C.M.'s answers may have led the child to believe that the interviewer wanted her to say these things. Dr. Clayman concluded that the facts were too cloudy for him to render a forensic psychological opinion as to whether the sexual abuse occurred.[6]

---

[6]Dr. Clayman did not interview, or administer any diagnostic tests to, the children or the respondent father.

Uncontradicted evidence at the adjudicatory hearing showed that the petitioner mother owed several thousands of dollars in unpaid child support to the respondent father, for which child support enforcement officials were pursuing a collection action during the same time period these abuse allegations surfaced. Although the circuit court did not make any findings of fact or conclusions of law regarding the child support matter, the respondent father argues that this debt would give the petitioner mother motivation to coach the children to fabricate abuse. The petitioner mother denies coaching or directing the children to lie. Although the respondent father claims that she is seeking to avoid paying child support, the petitioner mother explains that she has not taken action to eliminate her ongoing child support obligation.

After hearing the testimony at the adjudicatory hearing, the circuit court concluded that the DHHR failed to meet its burden of proving, by clear and convincing evidence, that abuse and neglect occurred. Accordingly, the circuit court dismissed the abuse and neglect petition. This appeal followed.

## II. Standard of Review

When reviewing a circuit court's order in an abuse and neglect case, we apply a "compound standard of review: conclusions of law are subject to a *de novo* review, while

10

findings of fact are weighed against a clearly erroneous standard." *In re Emily*, 208 W.Va. 325, 332, 540 S.E.2d 542, 549 (2000). This standard of review is well established:

> "Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996).

Syl. Pt. 1, *In re Cecil T.*, 228 W.Va. 89, 717 S.E.2d 873 (2011). Bearing these precepts in mind, we proceed to consider where the circuit court erred in its adjudication ruling.

### III. Discussion

### A. The Respondent Father

We begin our discussion by recognizing that a parent has constitutionally-protected rights to the care and custody of his or her child. *See, e.g.*, *In re F.S.*, 233 W.Va. 538, 543, 759 S.E.2d 769, 774 (2014); *In re Jeffrey R.L.*, 190 W.Va. 24, 32, 435 S.E.2d 162, 170 (1993). However, the rights of the parent must yield when the child's health or welfare is harmed or threatened.

11

As this Court stated in syllabus point three of *In re Katie S.*, 198 W.Va. 79, 479 S.E.2d 589 (1996), "[a]lthough parents have substantial rights that must be protected, the primary goal in cases involving abuse and neglect, as in all family law matters, must be the health and welfare of the children." Thus, while a parent's right is fundamental, it is certainly not absolute. A parent's right may be limited or ultimately terminated where it is relinquished, abandoned, or where the parent has engaged in conduct requiring restriction of parental rights.

*F.S.*, 233 W.Va. at 544, 759 S.E.2d at 775. "[T]he best interests of the child are paramount."

*Id.* (quoting *In re Jeffrey R.L.*, 190 W.Va. at 32, 435 S.E.2d at 170.). Accordingly, when there is reason to believe that a child has been subjected to abuse or neglect, a petition is filed in circuit court pursuant to West Virginia Code § 49-6-2 (2012)[7] and an adjudicatory hearing is held. At the conclusion of the adjudicatory hearing, the circuit court makes findings as to whether the child is abused or neglected. W.Va. Code § 49-6-2(c).[8] While a finding of abuse or neglect at the adjudicatory stage must be supported by clear and convincing proof, the statute does not specify any particular evidence that is required to meet this burden:

> """"W.Va. Code, 49-6-2(c) [1980], requires the State Department of Welfare [now the Department of Health and Human Resources], in a child abuse or neglect case, to prove "conditions existing at the time of the filing of the petition . . .

---

[7]When considering whether the circuit court erred in this matter, we rely on the statutes in effect when the circuit court entered its dismissal order on April 17, 2015. Effective in May of 2015, the West Virginia Legislature repealed West Virginia Code §§ 49-1-1 through 49-11-10 and recodified these statutes, with some revisions, at West Virginia Code §§ 49-1-101 through 49-7-304.

[8]If abuse or neglect is found during the adjudicatory stage, the case will proceed to post-adjudicatory matters and, ultimately, to disposition in accordance with the provisions of West Virginia Code § 49-6-5 (2012) (now codified at W.Va. Code § 49-4-604 (2015)).

12

> by clear and convincing proof." The statute, however, does not specify any particular manner or mode of testimony or evidence by which the State Department of Welfare is obligated to meet this burden.' Syllabus Point 1, *In Interest of S.C.*, 168 W.Va. 366, 284 S.E.2d 867 (1981)." Syllabus Point 1, *West Virginia Department of Human Services v. Peggy F.*, 184 W.Va. 60, 399 S.E.2d 460 (1990).' Syllabus Point 1, *In re Beth*, 192 W.Va. 656, 453 S.E.2d 639 (1994)." Syl. Pt. 3, *In re Christina L.*, 194 W.Va. 446, 460 S.E.2d 692 (1995).

*F.S.*, 233 W.Va. at 539, 759 S.E.2d at 770, syl. pt. 3.

Although we generally accord deference to a circuit court's findings of fact, this Court will not hesitate to reverse if those findings are clearly erroneous. For example, in *F.S.* the circuit court dismissed an abuse and neglect petition where there was no physical evidence and the child's testimony contained some doubtful or inconsistent elements. 233 W.Va. at 545, 759 S.E.2d at 776. We concluded that sexual abuse was nonetheless proven by the child's reiteration of sexually explicit details during multiple interviews. *Id.* at 546, 759 S.E.2d at 777. The Court explained in *F.S.* that an abuse and neglect petition does not require the evidentiary equivalent of what is necessary to prove a criminal case:

> This is a classic case of the inability of a trial court to ascertain, with complete certainty, the truth of the allegations of abuse. As indicated by the circuit court's adjudicatory order, one could quite effortlessly compile an inventory of doubts and skepticism based upon the evidence presented. The evidence is simply not crystal clear, beyond all doubt. However, that is not the standard to be employed in an abuse and neglect case. In reviewing the entirety of the evidence, this Court must adhere to the appellate standard of review set forth above, according significant weight to the circuit court's credibility

13

determinations while refusing to abdicate our responsibility to evaluate the evidence and determine whether an error has been committed.

> It is imperative to note that the evidence in an abuse and neglect case does not have to satisfy the stringent standard of beyond a reasonable doubt; the evidence must establish abuse by clear and convincing evidence. This Court has explained that "'clear and convincing' is the measure or degree of proof that will produce in the mind of the factfinder a firm belief or conviction as to the allegations sought to be established." *Brown v. Gobble*, 196 W.Va. 559, 564, 474 S.E.2d 489, 494 (1996) (internal citations omitted). We have also stated that the clear and convincing standard is "intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases." *Cramer v. W.Va. Dept. of Highways*, 180 W.Va. 97, 99 n. 1, 375 S.E.2d 568, 570 n. 1 (1988)[.]

233 W.Va. at 546, 759 S.E.2d at 777.

In the case *sub judice*, the petitioner mother contends that the circuit court's decision to dismiss this case was in error because there was clear and convincing evidence to adjudicate the respondent father as abusive. The DHHR, although denominated as a respondent in this matter, agrees that the respondent father should have been adjudicated as abusive. The children's guardian *ad litem* was non-committal in her summary response to this Court, but during oral argument she expressed serious concern for the children's welfare if they were to resume residency in their father's home. As set forth above, the respondent father argues that the petition was correctly dismissed because there are too many inconsistencies in the record. The respondent father also argues that both C.M. and D.M. are

14

lying and must have been coached by their mother to fabricate these allegations. Upon review of the appendix record, we are left with the definite and firm conviction that a mistake was committed and that the circuit court erred by not adjudicating the respondent father as abusive.

The record contains extensive evidence of abuse. As set forth above, on multiple occasions C.M. has described a sexually explicit video shown to her by her father, as well as specific acts of sexual contact inflicted on her by her father. She separately reported this information to her mother and/or maternal grandmother, CPS Worker Hendrickson, forensic interviewer Ms. Pogroszewski, and nurse practitioner Ms. Benton, and she testified in court about the sexual conduct. C.M., who was seven and eight years old during the investigation and adjudicatory proceedings, was able to recount detailed information about sexual behavior, including explaining the mechanics of oral sex and sexual intercourse. C.M. also explained how her father moved his penis and where he put his penis on her body, and she drew sketches depicting both her and her father's genitalia. Ms. Pogroszewski testified that children of C.M.'s age do not typically know about oral sex and do not have very detailed knowledge of "different parts going in different places" during sexual episodes. Both C.M. and her brother D.M. testified that their father made them watch a "sex" movie or movies on DVDs while they were in the living room of their West Virginia home, and the children told Ms. Hendrickson that their father had "special time" alone with

15

C.M. There was also testimony that C.M. was discovered engaging in sexual acting-out behavior with her minor cousin. Finally, although the findings of the physical examination were not determinative, they raised suspicion for the sexual assault nurse examiner when combined with the child's disclosure of abuse.

When dismissing the case against the respondent father, the circuit court was concerned by inconsistencies in the DHHR's evidence. While there are inconsistencies in this record, we nonetheless conclude that they are overstated and not fatal to the DHHR's abuse and neglect petition. As we discussed in *F.S.*, "one could quite effortlessly compile an inventory of doubts and skepticism based upon the evidence presented. The evidence is simply not crystal clear, beyond all doubt. However, that is not the standard to be employed in an abuse and neglect case." 233 W.Va. at 546, 759 S.E.2d at 777.

In reaching its decision to dismiss the petition, the circuit court was influenced by the recantations during CPS Worker Hendrickson's second trip to the school. The DHHR argues that this is easily explained by the fact that the children were fearful of their father and they knew Ms. Hendrickson had just come from talking to their father about these allegations.[9] There was further concern that the children may have thought they were in

---

[9]Even if Ms. Hendrickson did not directly tell the children that she had just spoken with their father and T.T., Ms. Hendrickson now had in her possession the children's iPods that were kept in their father's home.

trouble because the second interviews occurred in the school principal's office with some involvement by the principal.[10]  The circuit court dismissed these proffered reasons by finding that "a more plausible explanation for both [C.M.] and [D.M.] changing their story on the second interview by Ms. Hendrickson was because they realized that their father had been told of the allegations and that they may get into trouble for lying."  Critically, however, the circuit court failed to explain why this conclusion would be more plausible.  Indeed, a review of the record supports the DHHR's explanation.  During the initial, separate interviews conducted by Ms. Hendrickson, both C.M. and D.M. expressed fear of their father learning that they were discussing these matters.  C.M. also testified that her father had told her, "[d]on't tell anybody, or I'll give you a butt whipping."  The circuit court's rationale presupposes that both children, questioned separately, told consistent lies during their initial interviews with Ms. Hendrickson, but a more reasoned conclusion is that C.M.'s advanced sexual knowledge negates a narrative based upon prevarication.

The circuit court also found it "equally plausible" that the children were afraid of their maternal grandmother.  The basis for this finding is apparently the children's reluctance to reveal their iPod passwords.  The evidence shows that the grandmother gave the children the iPods, set up the devices with accounts linked to her own credit card, and

---

[10]According to Ms. Hendrickson, it was the school principal who obtained the iPod passwords from the children.  Ms. Hendrickson testified that she had been alone with each child when she interviewed them earlier in the day.

17

instructed the children not to share the passwords. Although the children obeyed their grandmother's instructions regarding the privacy of the passwords, we fail to see how this indicates any fear of her or how this would in any way suggest that the children lied about the abuse. Moreover, the children never testified that they were afraid of her; the only evidence on this issue was the mother's testimony that C.M. enjoyed spending time with her grandmother.

The circuit court also looked to Ms. Hendrickson's hearsay testimony that during the second interviews at the school, the children told her their "mother had told them to say these things." Both Ms. Hendrickson and the circuit court assumed that the children meant that their mother had instructed them to lie. However, in their courtroom testimony, both children denied that their mother ever told them to lie.[11]

The circuit court's order failed to even mention C.M.'s graphic sketches or her interview with Ms. Pogroszewski at the Child Advocacy Center, where C.M. revealed information very consistent with her testimony offered five months later at the adjudicatory

---

[11]In addition, a review of C.M.'s testimony suggests that it is possible Ms. Hendrickson could have misunderstood C.M.'s meaning during the second interview. During the preliminary hearing, the questioner referenced C.M.'s testimony about the abuse and then asked, "[d]id your mom at any time tell you to say this?" C.M. responded "yes" to this question. However, when asked a follow-up question, "what did your mom tell you to say?" C.M. answered, "[s]he says to just–to tell the truth." Because Ms. Hendrickson did not record the school interviews, it is impossible to know exactly what was asked or answered.

18

hearing. While the circuit court did discuss a statement the child made to nurse practitioner Benton at the Child Advocacy Center, the circuit court misstated this evidence. The circuit court's recollection of Ms. Benton's testimony was that C.M. said she was sexually abused by her father more than one time. However, a review of the transcript shows that Ms. Benton's testimony did not concern how many overall instances of abuse had occurred. Rather, Ms. Benton was referring to multiple acts of penetration during the incident of abuse that C.M. described in the forensic interview.

The circuit court further reasoned that if C.M. had told her mother about the video during C.M.'s visit in the summer of 2013, her mother would not have allowed the children to return to their father's home. However, the petitioner mother testified that she tried to investigate what her daughter told her by sending a text message to the respondent father and, importantly, C.M. had not revealed any molestation at that time. The petitioner mother explained that during the disclosures in 2013, C.M. only mentioned the viewing of sexually explicit movies.

The circuit court also considered an inconsistency regarding the whereabouts of C.M.'s infant half-brother, E.M. During the adjudicatory hearing, when asked where E.M. was during the episode in the living room, C.M. answered that he was with his mother T.T. If there was only one instance of abuse, as C.M. testified at the adjudicatory hearing, and if

19

C.M. first told her mother about the video during the summer of 2013, the court reasoned that the abuse must have occurred prior to the summer of 2013–before E.M. was born.

Upon this Court's thorough consideration of the record in this matter, we are unconvinced that the circuit court's concerns warranted dismissal of the petition. Regardless of when C.M. first disclosed information about the movie or how often she was shown the movie(s), the record is clear that the children were exposed to sexually explicit video materials. On multiple occasions, C.M. gave detailed recitations of the sexual conduct she observed. Moreover, although C.M. only revealed one instance of abuse when questioned at her forensic interview and the adjudicatory hearing, Ms. Pogroszewski explained that children sometimes have a hard time discussing multiple occasions. The interview technique Ms. Pogroszewski used with C.M. focused on the one incident in the living room when T.T. was out of the home. We remain mindful that when young children reveal information about sexual abuse, they are not always completely consistent or quick to tell the full details of what happened–particularly when their abuser is an adult family member in the home:

> [Cases involving sexual abuse of a child] generally pit the child's credibility against an adult's credibility and often times an adult family member's credibility. Since sexual abuse committed against children is such an aberrant behavior, most people find it easier to dismiss the child's testimony as being coached or made up or conclude that any touching of a child's private parts by an adult must have been by accident. In addition, children often have greater difficulty than adults in establishing precise dates of incidents of sexual abuse, not only because small children don't possess the same grasp of time as

20

adults, but because they obviously may not report acts of sexual abuse promptly, either because they are abused by a primary care-taker and authority figure and are therefore unaware such conduct is wrong, or because of threats of physical harm by one in almost total control of their life. In most cases of sexual abuse against children by a care-taker or relative, the acts of sexual abuse transpire over a substantial period of time, often several years. Consequently, under the existing collateral acts rule, a child victim is unable to present the complete record of events forming the context of the crime. Lastly, there is a common misconception that children have a greater propensity than adults to imagine or fabricate stories of sexual abuse. Research indicates, however, that absent coaching, children are far less likely to lie about matters in the sexual realm than adults, and that absent sexual experience there is little means by which children can imagine sexual transactions.

*State v. Edward Charles L.*, 183 W.Va. 641, 650-51, 398 S.E.2d 123, 132-33 (1990) [footnotes and citations omitted].

Moreover, the circuit court failed to adequately consider that displaying sexually graphic videos to the children was, by itself, harmful to their welfare. Both children testified that their father showed them a video or videos, and C.M.'s explicit knowledge of the sexual activities of adults supports that she was exposed to such materials. In *In re Joseph A.*, 199 W.Va. 438, 442-43, 485 S.E.2d 176, 180-81 (1997), we recognized that allowing children to view pornographic videos in the home constituted abuse and neglect. We did "not believe that it [was] necessary for the trial court to require the DHHR to present the testimony of an expert in order to conclude that watching pornography has harmful effects upon minor children." *Id.* at 442, 485 S.E.2d at 180. Displaying pornographic

21

material to children has been deemed abuse and neglect in other cases of this Court. *See, e.g.*, *In re Timber M.*, 231 W.Va. 44, 743 S.E.2d 352 (2013); *In re T.W.*, 230 W.Va. 172, 177 n. 3, 737 S.E.2d 69, 74 n. 3 (2012); *In re J.P.*, No. 14-0829, 2015 WL 2381310 (W.Va. May 18, 2015) (memorandum decision); *In re A.S.*, No. 11-1364, 2012 WL 2988799 (W.Va. Mar. 12, 2012) (memorandum decision).

Finally, as further support for the dismissal of the abuse and neglect petition, the circuit court relied on the children's failure to disclose abuse to officials at their school. We find this to be of very little persuasive value. C.M. and D.M. had not attended this particular school for very long–C.M. was only there for second grade and part of third grade. C.M.'s third grade teacher testified that C.M. never disclosed abuse to him, but it is obvious to this Court that a young girl could be reluctant to reveal sexual conduct to a male teacher. Furthermore, the school counselor worked at this particular school only two days per week, was responsible for more than seven hundred children, and her only direct conversation with C.M. was after the filing of the abuse and neglect petition.

After a careful review of the entire record, the Court is left with the definite and firm conviction that a mistake was committed and, consequently, that the circuit court's dismissal of the abuse and neglect petition was clear error. *See In re Cecil T.*, 228 W.Va. at 91, 717 S.E.2d at 875, syl. pt. 1. To prove parental abuse and neglect in this civil case, the

22

DHHR did not need to prove sexual penetration or that the conduct occurred multiple times.[12] The appendix record reveals that the DHHR presented clear and convincing evidence that the respondent father showed a sexually explicit video to C.M. and D.M. and engaged in some sort of sexual conduct with C.M. Accordingly, this case is remanded to the circuit court for entry of an order adjudicating C.M., D.M., and E.M. as abused children and the respondent father as an abusive parent, and for further proceedings consistent with this opinion.

**B. The Petitioner Mother**

The DHHR's underlying petition for abuse and neglect did not raise any allegations against the petitioner mother, with whom C.M. and D.M. have solely resided during the pendency of the circuit court proceedings and this appeal. However, while this matter was on appeal, the respondent father filed motions with this Court seeking to regain

---

[12]The statute in effect at the time of the circuit court's dismissal order defined an "abused child" as follows:

> "Abused child" means a child whose health or welfare is harmed or threatened by:
> (A) A parent, guardian or custodian who knowingly or intentionally inflicts, attempts to inflict or knowingly allows another person to inflict, physical injury or mental or emotional injury, upon the child or another child in the home;
> (B) Sexual abuse or sexual exploitation[.]

W.Va. Code § 49-1-3(1)(2012), in part.

physical custody of the children. He argued that the children were at risk in their mother's care due to an incident that occurred after the entry of the circuit court's April 17, 2015, order. According to a police "Incident/Investigation Report" submitted to this Court, the petitioner mother was arrested in North Carolina for possession of heroin, possession of drug paraphernalia, and child neglect. A narcotics officer stated in this report that the petitioner mother was found unresponsive with bleeding needle marks on her arm, in a car that had been traveling an estimated ninety miles per hour and had failed to stop for police. According to the police report, the petitioner mother's three-year-old child, A.M., was in the back seat of the car, unrestrained, in the presence of needles, including a needle containing a substance that the officer suspected was heroin.[13] The petitioner mother, by counsel, has denied any criminal culpability arising from this incident.

The custodial arrangements for C.M. and D.M. are within the jurisdiction of West Virginia Courts. Their custody was established by a West Virginia family court order in the parents' divorce, and in the course of this abuse and neglect case, that order was temporarily modified pending the outcome of this appeal. Although the circumstances surrounding the petitioner mother's alleged conduct are not before us for decision, this Court is reluctant to ignore an official police report that raises serious concern that the mother may

---

[13]A.M. is the petitioner mother's child from a relationship after her divorce from the respondent father. A.M. is not a subject child in the case *sub judice*.

be engaging in drug use and other behavior contrary to the health or welfare of C.M. and D.M.[14] When this Court is presented with information that a child may be at risk as a result of a child's custodial placement, we will take action to ensure the child's safety:

> In cases involving the abuse and neglect of children, when it appears from this Court's review of the record on appeal that the health and welfare of a child may be at risk as a result of the child's custodial placement, regardless of whether that placement is an issue raised in the appeal, this Court will take such action as it deems appropriate and necessary to protect that child.

*Timber M.*, 231 W.Va. at 47, 743 S.E.2d at 355, syl. pt. 6. This action may include ordering that an existing abuse and neglect petition be amended to include additional allegations:

> "To facilitate the prompt, fair and thorough resolution of abuse and neglect actions, if, in the course of a child abuse and/or neglect proceeding, a circuit court discerns from the evidence or allegations presented that reasonable cause exists to believe that additional abuse or neglect has occurred or is imminent which is not encompassed by the allegations contained in the Department of Health and Human Resource's petition, then pursuant to Rule 19 of the Rules of Procedure for Child Abuse and Neglect Proceedings [1997] the circuit court has the inherent authority to compel the Department to amend its petition to encompass the evidence or allegations." Syl. Pt. 5, *In re Randy H.*, 220 W.Va. 122, 640 S.E.2d 185 (2006).

---

[14]Although C.M. and D.M. were not in the car during the alleged incident described in the police report, our law recognizes that children living in the same household of a child who is abused or neglected may also be at risk. *See* W.Va. Code § 49-1-201 (2015) (defining "abused child" to include another child in the home); Syl. Pt. 2, *In re Christina L.*, 194 W.Va. 446, 460 S.E.2d 692 (1995).

25

*T.W.*, 230 W.Va. at 176, 737 S.E.2d at 73, syl. pt. 10.  In *T.W.* this Court ordered that on remand, the DHHR was to amend its petition to include allegations of abuse and neglect that were not previously asserted.  *Id.* at 181, 737 S.E.2d at 78.

Accordingly, for the protection of C.M. and D.M., the DHHR is directed to expeditiously investigate the factual allegations as set forth in the police report and determine whether the mother poses a threat to the health or welfare of these children.  If the accusations are substantiated, the DHHR shall immediately move to amend its abuse and neglect petition to include allegations against the mother.

## IV.  Conclusion

For the reasons set forth above, the circuit court's April 17, 2015, dismissal order is reversed.  The case is remanded to the circuit court for entry of an order adjudicating C.M., D.M., and E.M. as abused children based upon abuse perpetrated by the respondent father and adjudicating the respondent father as an abusive parent, and for further proceedings consistent with this opinion.  In addition, the DHHR shall expeditiously investigate the factual allegations raised against the petitioner mother in the police report and, if there is reason to believe that she presents a threat to the health or welfare of C.M. or

26

D.M., the DHHR shall immediately amend the abuse and neglect petition to include allegations against the mother.

Reversed and Remanded with Directions.