# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

*In re* **D.H.-1 and H.H.**

**No. 18-0032** (Raleigh County 16-JA-156 and 157)

**FILED**

**June 11, 2018**

EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

## MEMORANDUM DECISION

Petitioner Guardian Ad Litem ("guardian") Shannon L. Baldwin, on behalf of the children, appeals the Circuit Court of Raleigh County's December 13, 2017, order in which it declined to adjudicate the grandparents as abusing guardians.[1] The West Virginia Department of Health and Human Resources ("DHHR"), by counsel S.L. Evans, filed a response in opposition to the circuit court's order. The grandmother and legal guardian D.H.-2, by counsel Sidney H. Bell, filed a response in support of the circuit court's order. The grandfather E.H., by counsel Thad A. Bowyer, filed a response also in support of the circuit court's order. Mother K.C., by counsel Mary Beth Chapman, filed a response in opposition to the circuit court's order. Finally, Father J.H. filed a response taking no position on appeal. On appeal, the guardian argues that the circuit court erred in finding that there was not clear and convincing evidence of abuse and neglect of the children, finding that there was not clear and convincing evidence of non-accidental trauma to D.H.-1, and failing to terminate the guardianship and custodial rights of D.H.-2 and E.H. to the children.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds that the circuit court below erred in failing to adjudicate the grandparents of abuse and neglect. Accordingly, this case satisfies the "limited circumstances" requirement of Rule 21(d) of the West Virginia Rules of Appellate Procedure, and a memorandum decision is appropriate to resolve the issues presented.

In September of 2016, the DHHR filed an abuse and neglect petition against the children's legal guardians D.H.-2 and E.H., the paternal step-grandmother and paternal grandfather, respectively. The DHHR stated that it received two referrals from D.H.-1's teacher regarding alleged physical abuse perpetrated by D.H.-2 against then five-year-old D.H.-1. The

---

[1]Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W.Va. 254, 773 S.E.2d 20 (2015); *Melinda H. v. William R. II*, 230 W.Va. 731, 742 S.E.2d 419 (2013); *State v. Brandon B.*, 218 W.Va. 324, 624 S.E.2d 761 (2005); *State v. Edward Charles L.*, 183 W.Va. 641, 398 S.E.2d 123 (1990). Additionally, because one of the children and the step-grandmother share the same initials, we will refer to them as D.H.-1 and D.H.-2, respectively, throughout this memorandum decision.

1

first referral indicated that the child reported to his teacher that D.H.-2 hit him in the nose with a dry erase board when he would not complete his homework. The child's nose had two small abrasions and was bruised and swollen. A CPS worker interviewed D.H.-2, who confirmed that the child owned a dry erase board but stated that he scratched his nose while playing with it. The child was taken to the hospital and consistently reported to the medical staff that D.H.-2 hit him. A temporary protection plan was put into place at that time and the children were placed with a relative. Approximately one week later, the children were returned to the grandparents' home. The second referral, received shortly thereafter, indicated that D.H.-1 reported that D.H.-2 kicked him in the stomach, causing him to fall backwards and strike his head on a washing machine. A golf-ball-sized knot was observed on the back of the child's head. A CPS worker interviewed the child, who reported that D.H.-2 kicked him when he would not respond to her questions about why he had gotten in trouble at school for "flipping people off." However, D.H.-2 informed the CPS worker that the child fell after climbing out of the bathtub. CPS subsequently filed an application for ratification of emergency custody for the children.

During the preliminary hearing held in December of 2016, the circuit court found probable cause to proceed against the grandparents and scheduled an adjudicatory hearing. The first adjudicatory hearing was held in February of 2017, wherein the DHHR presented the testimony of D.H.-1's teacher regarding his disclosures of the abuse perpetrated by D.H.-2. The teacher testified that she observed the scrapes and swelling to the child's nose and the knot on the back of his head. Regarding the second disclosure, the teacher testified that the child consistently reported the abuse to several other people including an aide, a counselor, the vice principal, and the principal. The teacher also indicated that she had seen the child attempt to injure himself by smacking his head on the desk, pinching himself, and biting himself. However, she testified that the child never hit himself hard enough to break the skin, cause bleeding, or cause knots to form. The teacher further testified that during a meeting, D.H.-2 informed her that the child also harmed himself at home, including breaking his own arm. After hearing this testimony, the hearing was continued in order to review the child's interview, which was conducted at a local Child Advocacy Center ("CAC"), and obtain medical records.

After another continuance, the adjudicatory hearing was reconvened in May of 2017. The circuit court admitted the child's CAC interview into evidence and heard the testimony of several witnesses. A social worker from the Children's Home Society testified that D.H.-1 had two scars on the back of his head and a flat nose due to trauma. The social worker also testified that the child had a "cauliflower ear," which a doctor opined resulted from trauma.[2] When questioned regarding the child's ear, the social worker stated that the child reported he had been hit by a car door, but did not disclose whether the incident was intentional or who had closed the car door. The social worker also testified that the child had not attempted to self-harm since being out of the grandparents' care. Finally, the social worker testified that the child made the same disclosures regarding his injuries to a psychologist during an evaluation and further disclosed

---

[2] "The term "cauliflower ear" refers to a deformity of the ear caused by blunt trauma or other injury . . . . Left untreated, the injury leads to a blockage that prevents blood flow and damages tissue. This results in a bumpy or lumpy appearance on part of the ear, similar to a cauliflower." Cauliflower Ear, https://www.webmd.com/skin-problems-and-treatments/cauliflower-ear-symptoms-causes-treatments#1 (last visited April 25, 2018).

that D.H.-2 had previously broken his arm. The biological father then testified that D.H.-1's ear and nose had not always been damaged. The father also testified that D.H.-1 had broken his arm in 2015. The father stated that at that time, he was informed that the child's arm was fractured when D.H.-2 pulled the child's arm through a shirtsleeve. Further, each time he asked the grandparents about the event, they told the father that the fracture occurred by pulling D.H.-1's arm through his shirtsleeve and provided no other explanation. The CPS worker then testified that CPS received a referral regarding D.H.-1's fractured arm in 2015. According to the referral, the child had a spiral fracture of the humerus of the left arm. The hospital referred the matter due to the suspicious account of how the injury occurred, but CPS was unable to substantiate any abuse. After hearing evidence, the circuit court continued the adjudicatory hearing.

In July of 2017, the circuit court reconvened the adjudicatory hearing wherein it heard testimony regarding several of D.H.-1's medical records. D.H.-1's dental records revealed that the child had a dead tooth, which the dentist opined was likely the result of trauma. Testimony established that the child had not had any trauma to his face or tooth while in foster care. Several of D.H.-1's medical records were introduced into evidence, including records from when the child was seen at the hospital after reporting that he had been kicked by D.H.-2. The hospital performed a full-body scan of the child at that time and found two to three rib fractures. A growth chart introduced indicated that D.H.-1 was in the ninetieth percentile for weight prior to being placed with the grandparents. After being placed with the grandparents, D.H.-1 dropped as low as the twenty-second percentile. After hearing evidence, the circuit court continued the adjudicatory hearing.

The guardian filed an amended petition in August of 2017, adding new allegations regarding D.H.-1's spiral fracture of the left arm while under the grandparents' guardianship. The guardian noted the hospital report recorded D.H.-2's explanation that the fracture occurred when she was pulling the child's arm through his shirt sleeve. However, this explanation was inconsistent with the teacher's testimony that D.H.-2 told her the child had broken his own arm for attention. The petition also contained allegations regarding the child's left rib fractures. The guardian alleged that both of these injuries were non-accidental trauma.

In September of 2017, the circuit court once again reconvened the adjudicatory hearing. Joan M. Phillips, M.D., testified regarding D.H.-1's injuries. Dr. Phillips was introduced as an expert witness as she has had permanent board certification by the American Board of Pediatrics since 1985, has been licensed to practice medicine in the State of West Virginia since 1981, and has a sub-board certification from the American Board of Pediatrics in child abuse pediatrics. Dr. Phillips worked as the co-medical director for the Child and Advocacy Center and worked at Women's and Children's Hospital in Charleston, West Virginia. She submitted a report of her findings and testified that D.H.-1's rib fractures were highly specific for child abuse. Specifically, she stated

> [p]osterolateral rib fractures – "posterior" meaning in the back near the spine and a little more lateral. Those are fractures that are highly unusual in accidents. The only kind of accident that would occur in that area that would leave that kind of injury would be something like a pedestrian/motor vehicle accident. Because the rib attaches to the spinal cord or the tuberal column, the most common injury

3

that's inflicted is a squeezing injury and it's like a fulcrum and it snaps in the posterolateral – posterior position. So it is one that has been identified in literature as highly specific for child abuse.

She did note that the fractures were beginning to heal at the time the full-body scan was performed and, as such, would have occurred prior to the report of being kicked by D.H.-2.

Regarding the child's spiral fracture of the left arm, Dr. Phillips testified that it could have occurred in an accident or by child abuse. She stated that a fracture of that nature could be caused by falling on an extended arm, but noted that the medical records did not disclose a fall and only cited D.H.-2's explanation that the fracture occurred by pulling the child's arm through a shirtsleeve. Dr. Phillips noted that it could have been possible to hear a popping sound when pulling the child's arm through a shirtsleeve if it was already broken. She denied that it would have been biomechanically possible for D.H.-1, who was three years and ten months old at the time of the fracture, to intentionally break his own arm. Regarding the child's nose, Dr. Phillips noted that it was unlikely that D.H.-1 injured himself by hitting his head on a desk, as his forehead would have been the more likely spot to hit. She also noted that abused children are more likely to have externalized patterns of aggressive or antisocial behavior.

Dr. Phillips also testified regarding D.H.-1's growth patterns and noted that he dropped from the ninety-seventh percentile to the twenty-second percentile. Specifically, she noted that D.H.-1 weighed thirty-two pounds at age two, which increased to thirty-six pounds by nearly age two and one half. However, the child dropped to thirty-two pounds by age three and only weighed thirty-three pounds by age four. D.H.-1 was also behind in height. Dr. Phillips testified that the growth chart was significant because "once a child establishes a growth curve they tend to stay on that growth curve." A significant decline in growth, or failure to thrive, was an indicator that something was wrong. She further testified that after being removed from the grandparents' home, the child's growth climbed to between the fiftieth and seventy-fifth percentile and she noted that this was indicative that, nutritionally, there was a difference in environment at ages three and four, and age six. Based on these factors, Dr. Phillips concluded that D.H.-1 was the victim of child abuse. The circuit court then continued the adjudicatory hearing.

A final adjudicatory hearing was held in November of 2017. D.H.-2 testified that she did not injure the children and that they had been hurt a few times in her care due to roughhousing. She testified that she had discussed D.H.-1's weight with the pediatrician. She noted that the child had been eating unhealthy things such as "gummies" when in the care of his biological parents and that she changed his diet to include healthy foods such as fruits and vegetables and she attributed the child's weight loss to the change in diet and his active lifestyle. Regarding the child's fractured arm, D.H.-2 testified that she never told the teacher that D.H.-1 broke his own arm to gain attention. Instead, she stated that on the day of the incident, the children had been playing in a children's pool on the deck and she assumed D.H.-1 must have slipped and fallen. She also testified that she had no explanation for how D.H.-1 sustained fractures to his ribs despite admitting that she was the primary caretaker for the child. Regarding the child's nose, D.H.-2 testified that she recalled seeing an abrasion but stated that the swelling was due to allergies. D.H.-2 stated she did not know why the child would accuse her of hitting him.

Thereafter, E.H. testified and attributed D.H.-1's fractured arm to falling while playing in the pool. E.H. stated that he observed the children playing and roughhousing in the water, falling many times. E.H. stated D.H.-1 came into the house to change clothes and that when D.H.-2 was helping him, she heard his arm pop. E.H. testified that D.H.-1 did not exhibit symptoms of pain and never accused D.H.-2 of breaking his arm. E.H. also testified that he did not know of anyone who would have fractured the child's ribs. He stated that he and D.H.-2 regularly took the children to pediatricians, and also scheduled appointments with medical professionals to assess the source of D.H.-1's disruptive behavior. After hearing evidence, the circuit court found that the DHHR and guardian had not presented clear and convincing evidence that the children were abused or neglected by the grandparents. The circuit court noted that testimony established that D.H.-1 had previously accused his peers of injuring him, that he did not report the fractured ribs, and that he did not seem to notice when his arm was fractured. Moreover, the circuit court found that the grandparents obtained routine medical care for the children, which it noted was not the practice of a physically abusive parent or custodian. It is from the December 13, 2017, order that the guardian appeals.

The Court has previously established the following standard of review:

"Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996).

Syl. Pt. 1, *In re Cecil T.*, 228 W.Va. 89, 717 S.E.2d 873 (2011).

On appeal, petitioner guardian, along with the DHHR and the biological mother, argues that the circuit court erred in declining to adjudicate the grandparents guilty of abuse and neglect when sufficient evidence existed to prove that D.H.-1 suffered non-accidental trauma while under their care. Specifically, petitioner guardian asserts that expert testimony established that D.H.-1 was the victim of abuse and neglect. While in the grandparents' care, the child sustained a spiral fracture to the arm, abrasions to the nose, a knot on the back of the head, a cauliflower ear, a dead tooth, and fractured ribs. The expert witness opined that the fractured ribs were particularly indicative of abuse, as the only accident that could have caused the injury apart from intentional abuse was being hit by a motor vehicle. Moreover, petitioner asserts that the grandparents did not provide consistent explanations for the injuries or provided no explanations at all. Finally, the child consistently reported two instances of abuse perpetrated by D.H.-2 to

several people. After reviewing the record, we agree with petitioner's assertions. We have previously noted as follows:

> At the conclusion of the adjudicatory hearing, the court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. . . . The findings must be based upon conditions existing at the time of the filing of the petition and proven by clear and convincing evidence.

*In re F.S.*, 233 W.Va. 538, 544, 759 S.E.2d 769, 775 (2014). This Court has explained that "'clear and convincing' is the measure or degree of proof that will produce in the mind of the factfinder a firm belief or conviction as to the allegations sought to be established." *In re F.S.*, 233 W.Va. at 546, 759 S.E.2d at 777 (citing *Brown v. Gobble*, 196 W.Va. 559, 564, 474 S.E.2d 489, 494 (1996)). However, "the clear and convincing standard is 'intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases.'" *In re F.S.*, 233 W.Va. at 546, 759 S.E.2d at 777 (quoting *Cramer v. W.Va. Dep't of Highways*, 180 W.Va. 97, 99 n.1, 375 S.E.2d 568, 570 n.1 (1988)).

> Pursuant to West Virginia Code § 49-1-201,
>
> "'[an a]bused child' means: (1) [a] child whose health or welfare is being harmed or threatened by: (A) A parent, guardian or custodian who knowingly or intentionally inflicts, attempts to inflict or knowingly allows another person to inflict, physical injury or mental or emotional injury, upon the child or another child in the home. Physical injury may include an injury to the child as a result of excessive corporal punishment[.]"

At the conclusion of the adjudicatory hearing, the circuit court found that there was evidence of injury to the child, which occurred while he was in the custody of the grandparents. However, the circuit court also noted that the child had a history of inaccurately reporting injuries, that there was evidence that the child did not cry over the fractured arm or report the pain in his ribs, and that the grandparents routinely took the children to the doctor. The circuit court noted that while certain things were not completely understood, it found the totality of the evidence did not meet the clear and convincing burden of proof. After reviewing the record, we disagree.

We have previously noted that "one could quite effortlessly compile an inventory of doubts and skepticism based upon the evidence presented. The evidence is simply not crystal clear, beyond all doubt. However, that is not the standard to be employed in an abuse and neglect case." *In re C.M.*, 236 W.Va. 576, 583, 782 S.E. 2d 763, 770 (2016)(quoting *In re F.S.*, 233 W.Va. at 546, 759 S.E.2d at 777). Here, the circuit court's findings were simply not plausible in light of the record viewed in its entirety. The children were placed with the grandparents around 2014 and by September of 2016, D.H.-1 had sustained several serious injuries, many of which were not sufficiently explained. While Dr. Phillips testified that the child's arm could have been broken accidentally, the grandparents did not allege that the child fell while playing in the pool until the underlying proceedings were initiated. Throughout the medical records, the only

6

explanation given by the grandparents was that D.H.-2 heard a popping sound when pulling the child's arm through a shirtsleeve. Finding this explanation suspicious, the hospital referred the case to CPS and again, no explanation of a fall was provided.

Additionally, the grandparents had no explanation for how the child's ribs were fractured. Dr. Phillips' testimony established that the injury was most likely caused by intentionally squeezing the child, stating that the only other way of sustaining such an injury was to be struck by a vehicle. No such accident was reported. According to Dr. Phillips, the absence of explanation by the grandparents was "a red flag in itself." We have previously held

> "[p]arental rights may be terminated where there is clear and convincing evidence that the infant child has suffered extensive physical abuse while in the custody of his or her parents, and there is no reasonable likelihood that the conditions of abuse can be substantially corrected because the perpetrator of the abuse has not been identified and the parents, even in the face of knowledge of the abuse, have taken no action to identify the abuser." Syllabus Point 3, *In re Jeffrey R.L.,* 190 W.Va. 24, 435 S.E.2d 162 (1993).

Syl. Pt. 4, *In re Harley C.,* 203 W.Va. 594, 509 S.E.2d 875 (1998). Further, the grandparents were also inconsistent in explaining the injuries that D.H.-1 reported to his teacher. D.H.-1 consistently told several people, including school and hospital staff, that D.H.-2 hit him in the nose with a dry erase board and kicked him, causing him to fall and strike his head. While the grandparents assert that the child was merely a rambunctious boy prone to accidents or had a history of blaming others for self-inflicted injuries, the record does not support these arguments. E.H. testified during the final adjudicatory hearing that he was on the phone with D.H.-2 when he heard the child fall and hit his head. However, the grandparents did not mention this fact in the year prior to his testimony at the adjudicatory hearing. Further, the testimony of both the teacher and the grandfather established that, although the child blamed others for his actions at times, he was always quick to admit the truth when asked. Here, the record demonstrates that the child told several people about the injuries to his nose and head and that his story was consistent and never wavered.

While injuries such as the dead tooth and the cauliflower ear may be attributed to accidental trauma or infection, other injuries sustained by the child cannot. Crucially, testimony established that the child's fractured ribs are highly indicative of abuse, having been caused by squeezing the child or a vehicle accident. Moreover, the child unexplainably dropped from the ninety-seventh growth percentile to the twenty-second percentile while in the grandparents' care. Yet after being removed from the home and placed in foster care, the child's growth rapidly climbed to between the fiftieth and seventy-fifth percentile, demonstrating a lack of nutrition while in the grandparents' care. These unexplained injuries, along with the child's consistent disclosures, leave this Court with the definite and firm conviction that a mistake was committed and, consequently, that the circuit court's dismissal of the abuse and neglect petition was clear error. Because we find that the circuit court erred in failing to adjudicate the grandparents of abuse and neglect and are remanding for further proceedings consistent with this memorandum decision, addressing petitioner's remaining assignments of error is unnecessary.

For the foregoing reasons, we reverse the circuit court's December 13, 2017, order and remand with instructions to the circuit court to enter an order adjudicating D.H.-1 and H.H. as abused children and the respondent grandparents as abusing guardians, to forthwith hold a dispositional hearing in compliance with Chapter 49 of the West Virginia Code and the West Virginia Rules of Procedure for Child Abuse and Neglect Proceedings, and for further proceedings consistent with this memorandum decision.

Reversed and remanded, with instructions.

**ISSUED**:  June 11, 2018

**CONCURRED IN BY**:

Chief Justice Margaret L. Workman
Justice Robin Jean Davis
Justice Menis E. Ketchum
Justice Elizabeth D. Walker

Justice Loughry, Allen H., II suspended and therefore not participating.