**STATE OF WEST VIRGINIA**

**FILED**

**May 14, 2025**

*In re* **J.E.**

released at 3:00 p.m.
C. CASEY FORBES, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**No. 24-389 (Berkeley County CC-02-2024-JA-59)**

**MEMORANDUM DECISION**

Petitioner Father Q.E.[1] appeals the June 29, 2024, order entered by the Circuit Court of Berkeley County, West Virginia, dismissing the abuse and neglect petition filed in this case.[2] He argues that the court erred: 1) in finding that the DHS failed to prove by clear and convincing evidence the allegations of sexual abuse committed against his child, J.E. ("J.E." or "the child"), by the mother's boyfriend, despite the fact that the court's order included some of the child's disclosures of sexual abuse; 2) in finding that the DHS's burden of proof had not been met, notwithstanding the evidence adduced during the adjudicatory hearing; 3) by including findings of

---

[1] The petitioner appears by counsel Debbie Flowers Payne. Respondent J.R. ("the mother") appears by counsel Jason Michael Stedman. Respondent W.Z. ("the boyfriend") appears by counsel John J. Balenovich. The West Virginia Department of Human Services appears by counsel Attorney General John B. McCuskey and Assistant Attorney General Lee Niezgoda. Because a new Attorney General took office while this appeal was pending, his name has been substituted as counsel. Counsel Tracy Weese appears as the child's guardian ad litem.

Additionally, pursuant to West Virginia Code § 5F-2-1a, the agency formerly known as the West Virginia Department of Health and Human Resources was terminated. It is now three separate agencies—the Department of Health Facilities, the Department of Health, and the Department of Human Services. *See* W. Va. Code § 5F-1-2. For purposes of abuse and neglect appeals, the agency is now the Department of Human Services ("DHS").

[2] We use initials where necessary to protect the identities of those involved in this case. *See* W. Va. R. App. P. 40(e).

fact in the order that are not consistent with the actual sworn testimony presented at the adjudicatory hearing; and, 4) in dismissing the abuse and neglect petition.[3]

The respondent mother and the petitioner, who is a nonoffending father, are the biological parents of the child, J.E. The mother testified that she and the petitioner instituted divorce proceedings in August, 2021, in the family court of Berkeley County, West Virginia, and have shared 50/50 custody of the child since 2022. The mother and her boyfriend, who have lived together for about four years, now reside in Virginia. They have two other children together, who are J.E.'s younger half-siblings.[4]

On January 3, 2024, the father filed a "Motion for Ex Parte Relief" in Berkeley County Family Court, seeking temporary sole physical custody of the child and suspension of any visitation between the child and the mother; the petition was based on various incidents and statements that were conveyed to the father by J.E., who was then five years old. The disclosures included, inter alia: that the mother's boyfriend had pushed him down the stairs and injured his chin; that a "bad guy comes in the night at his mommy's house"; that the child asked the petitioner's wife to "touch" his penis; that the boyfriend would poke the child in his private areas with his fingers; that the child stated, in response to seeing a pair of "candy cane themed" underwear, that "O[]'s daddy puts his candy cane penis" in the child's mouth; and that the child didn't want either the mother or the boyfriend to know he had told the petitioner about these things. In the motion the petitioner also described an incident where the child tried to pull down the petitioner's wife's shorts and underwear, and when reprimanded stated that "O[]'s daddy" does that to him. The petitioner's motion further represented that the child no longer wanted to see his therapist because "his mommy told him that she will go to jail if he talks" to her, and that the petitioner was "concern[ed] for the safety and well-being of the child during the visits" with mother. The petitioner asked the family court to place the child in his temporary sole custody, suspend visitation until the child's statements had been investigated, and order that neither party speak with the child about the disclosures.

The petitioner's motion detailing the child's disclosures of the boyfriend's sexual contact with him resulted in an overlap referral to Child Protective Services ("CPS"). In January, 2024, the DHS arranged for a forensic interview of the child at a Child Advocacy Center ("CAC") as part of its investigation. During the CAC interview the child disclosed, among other things, that the boyfriend: got "super mad" and put the child in the corner; smacked the child's head and "did something wrong, something bad"; smacked the child's back; touched the child's "pee-pee" while he was in the shower; touched the child when he had no clothes on more than one occasion; touched

---

[3] Because the petitioner's assigned errors are duplicative, we have consolidated them for purposes of this appeal. *See Corey D. v. Travis R.,* 245 W. Va. 232, 234, n.4, 858 S.E.2d 857, 859 n.4 (2021).

[4] The younger half-siblings are O.Z. and B.Z. They were originally named in the abuse and neglect petition but were dismissed from the action at the preliminary hearing on jurisdictional grounds, as they reside in Virginia with their parents and have no contact with West Virginia.

the child's "pee-pee" while the child was sleeping; came into the child's room and touched the child's "pee-pee" and butt after shutting the door; and pulled the child's pants down and touched his body everywhere. Further, the child stated that both the mother and the boyfriend smacked each other.

The DHS filed an abuse and neglect petition in March, 2024, alleging, in part, that based on the child's disclosures to his father, a CPS worker's interviews of the petitioner, the stepmother, the mother, the boyfriend, and the child's therapist, Dr. Gail Shade; and the CAC interview of the child, the mother's boyfriend sexually abused the child;[5] that the mother "abused and neglected" the child by "knowingly allow[ing] another to commit sexual abuse" upon the child and "fail[ing] to protect" the child from harm;[6] that the boyfriend physically abused the mother while the child was present in the home; and that the mother and the boyfriend "failed to take appropriate action to prevent the abuse of the Infant[] . . . by engaging in domestic violence in the presence, including hearing, of the Infant." In its "Order Upon Filing Petition" entered on March 25, 2024, the circuit court found that the allegations contained in the petition "constitute[d] substantial danger to the health and welfare of the child[] and remaining in the home of [the mother and the boyfriend] [wa]s contrary to the child[]'s welfare[.]" The court gave the father temporary full custody of the child, with no visitation to the mother and the boyfriend unless approved by the multidisciplinary team ("MDT").

On two different days in May and June, 2024, the circuit court conducted an adjudicatory hearing in which five individuals testified: the boyfriend, the mother, the petitioner, the CPS worker,[7] and Dr. Shade, the therapist[8] who began seeing the child in 2022 after a referral was made in the family court proceeding for her to assist with the development of a parenting plan. The CAC

---

[5] *See* W. Va. Code § 49-1-201(1)(B) (defining "[a]bused child" to include "[a] child whose health or welfare is being harmed or threatened by . . . [s]exual abuse . . . [.]"); *see also id.* § 49-1-201(defining "sexual abuse" to include "sexual intrusion" and "sexual contact").

[6] *See id.* § 49-1-201(1)(A) (defining "[a]bused child" to include "[a] child whose health or welfare is being harmed or threatened by . . . [a] parent, guardian, or custodian who . . . knowingly allows another person to inflict, physical injury or mental or emotional injury, upon the child . . . in the home.").

[7] The CPS worker, Tonya McClure, testified only as to the decision to file the petition in Berkeley County where the family court proceedings were pending rather than in Jefferson County where the child then resided with his father. We note that no party has assigned error in this regard, and thus we do not consider it. *See* Syl. Pt. 2, *Hansbarger v. Cook,* 177 W. Va. 152, 351 S.E.2d 65 (1986) ("Venue is not a jurisdictional question in the strict sense of the word, but rather, is a matter of personal privilege which may be waived by any party, including the State.").

[8] Dr. Shade is a licensed professional counselor; she testified that she has a master's degree in counseling psychology and a doctorate in clinical psychology. She was qualified as an expert by the circuit court.

interview was admitted into evidence during the proceeding, but the court would not allow the CAC interviewer to testify.[9]

In his testimony, the mother's boyfriend denied the allegations against him, claiming that even though he had lived with the mother for four years – since the child was one year old – he had *never* been alone with the child. With one exception, an occasion when the mother was pregnant and he had assisted her with changing J.E.'s diaper, he had never given the child a bath, changed his diaper, or helped him with potty training. He testified that he did not help J.E. get dressed in the morning, did not cook breakfast for him and feed him, did not take him shopping with his brothers, and only took the children (including the child's half-siblings) to the park if the mother asked him to do so. He further testified that while he handles the discipline of the other children, he did not discipline J.E. In response to being asked whether he had ever disciplined the child by smacking him, the boyfriend stated that he had not done that for two years. He initially asserted his Fifth Amendment right against self-incrimination[10] in response to several specific questions, including whether he had touched J.E. on his butt, legs, or penis, whether he had touched the child while the child was sleeping, whether he had ever been sexually inappropriate with the child, and whether he had ever shaken the child's penis. However, the boyfriend testified again so that he could answer questions that he previously refused to answer because he did "not quite understand[] everything that goes involved [sic] with" invoking his right against self-incrimination. Even though the boyfriend had denied ever being alone with J.E., he claimed that he and the child "had a close relationship for quite sometime[,] and that he "took care of him," clarifying that everything was done at the direction of the mother. He also stated that he had not threatened or struck the mother, and that he was almost never in the home because of his work. Finally, he testified that he thought the child had been coached because, "If it quacks like a duck, it looks like a duck, it's normally a duck."

---

[9] The circuit court explained because it watched the CAC interview, it saw no need to hear from the CAC interviewer as a witness. The court rejected the petitioner's argument that the interviewer should be permitted to give an opinion as to whether there were "elements of credibility or any signs of influence, . . ." stating that "[s]he gives her opinion on that interview, but she doesn't factor in anything else about the case in giving that so it is such a limited opinion."

[10] The Fifth Amendment of the United State Constitution provides that "[n]o person shall be . . . compelled in any criminal case to be a witness against himself[.]" However, we previously have held that

> [b]ecause the purpose of an abuse and neglect proceeding is remedial, where the parent or guardian fails to respond to probative evidence offered against him/her during the course of an abuse and neglect proceeding, a lower court may properly consider that individual's silence as affirmative evidence of that individual's culpability.

Syl. Pt. 2, *W. Va. Dept. of Health & Hum. Res. ex rel. Wright v. Doris S.,* 197 W.Va. 489, 475 S.E.2d 865 (1996).

4

The mother testified that her boyfriend had been in J.E.'s life since the child was about one year old. She stated that the only disclosure that was ever brought to her attention was when the petitioner told her that the boyfriend hurt the child's face at night, to which she responded that the child had not told her that and that the petitioner should contact CPS. She further testified that she was unaware of any other disclosure that the child had made, as the child "tells me nothing." She testified that the boyfriend had never been alone with the child in the four years that they had been together, and that there had never been a time when the boyfriend was awake while she was asleep, as she is a "very light sleeper." While she stated that she did not think her child was lying, she could "add context behind" the disclosures. The mother then testified that *she* had actually told her child to "shake his penis . . . because I was teaching him to pee standing up." She said that even though her child had disclosed that it was the boyfriend who told him to shake his penis, the mother stated that "he's never alone with [the child] to have the opportunity to tell him or to shake a penis." Adding further "context" to the child's disclosures that the boyfriend touched his butt, "pee-pee," and legs, the mother stated, "I think [the child] is taking things and with his speech delay I think he's expressing situations poorly. . . . [The child] will use words that don't belong in the sentence." When the mother was questioned about the disclosures J.E. had made during the CAC interview when he pointed at an anatomical drawing and said that the boyfriend "touches" him inappropriately, she stated that her child "didn't add any context behind that." Additionally, the mother reiterated that J.E. wasn't lying, but that what he had disclosed could not have occurred because she was always there, and "[t]here's a lot of stuff in that CAC [interview] that was said that is not true." When questioned as to why she was so protective of the child by being the only person to change him, shower him, and bathe him, the mother stated that "the only reason why I'm very protective is because I do have his father involved, and I do owe that respect to his father . . . [and] at the end of the day I don't know how comfortable I would be with anybody else doing that with [the child]." The mother also stated that the child wanted his mother and father to be back together. Finally, the mother testified that she did not believe her boyfriend had sexually molested the child.

Dr. Shade testified that in March, 2023, the petitioner reached out to her and informed her that J.E. wasn't handling the custody transitions well, was becoming clingier, and had a lot of anxiety. Dr. Shade stated that the child indicated that "O[]'s daddy is mean." The child also disclosed to her that "O[]'s daddy would pull his pants down and spank him, and that he would yell at him, and that he knew that O[]'s daddy did not like his daddy and stepmom." Dr. Shade stated that at a session in November, 2023, the child continued to report that the boyfriend yelled at him, spanked him for wanting to talk to his daddy on the phone, and spanked him with his pants pulled down. Interestingly, while Dr. Shade reported that the child stuttered and struggled with speech at times, he had been going to speech therapy and "it was helping tremendously." Dr. Shade stated that there was a slight break in sessions and she did not see the child until the day after his forensic interview had occurred in January, 2024. She stated that "it was a pretty profound session" in that J.E. disclosed to her that the boyfriend shook his penis, told the child to come into a bedroom for a prize, and had hurt him. She described the child as having a change in demeanor and being very anxious when he discussed the boyfriend, and that the child didn't have eye contact with her. Dr. Shade opined that the child was not coached because "[h]e's so random that it's very difficult for me to believe that he was coached, and the progression of this case also leads me to believe that he was not – he was not coached to say these things. I think something legitimately did happen to him." She later clarified that "I believe that he [referring to the child] was touched

5

inappropriately and the person he continues to accuse of that is O[]'s daddy [the boyfriend] . . . ." Dr. Shade again testified that "it does appear to be something sexually inappropriate was happening." She stated that after the child's disclosures she had a joint therapy session with both mother and father in which "Mom accused Dad of being a liar in my office, and basically that [the child] was not telling the truth, and that he was making all these things up. Her feeling was he was making all of these things up to get the two of them back together." According to Dr. Shade, she also found out during this session that the mother told her that the boyfriend "does all of the discipline at her home[.] . . ."

Finally, the petitioner testified, recounting the disclosures that the child had made to him and to the child's stepmother. The petitioner testified that on New Year's Eve, 2023, J.E. was with him and his wife at the child's paternal grandmother's home. The child was playing with the petitioner when he made a statement about "keeping a naked secret" and that "O[]'s daddy makes him keep a naked secret." Shortly after this disclosure, the child attempted to jab a toy sword into the petitioner's anal area. When the petitioner told the child that he should not do that, the child responded, "O[]'s daddy likes to do that to me." The child also disclosed that "O[]'s daddy touches his penis and pushes his finger in his butt." There was also a disclosure involving the petitioner's candy cane-themed underwear; when the child saw the underwear, he made a comment about "candy cane penis" and that "O[]'s daddy makes me suck on those." The father stated that the child was not doing well in school during the time between the fall of 2023 and January of 2024. He stated that it was hard to get the child to eat, he was constantly getting sick, had constant anxiety, and suffered from "mini panic attacks . . . usually around the time of going back to his mother's house."

At the close of the adjudicatory hearing, the circuit court stated that

> I will tell you probably the best case scenario . . . is if my rulings are limited to the corporal punishment issues as opposed to the sexual issues so I anticipate there's going to be some type of a disposition hearing one way or the other because we heard a lot from Dr. Shade about the anxiety of this child with . . . [the boyfriend's] anger in the household as it is directed and related to him.

However, on June 29, 2024, the circuit court did the exact opposite: the court entered an order dismissing the abuse and neglect petition, finding that the DHS had failed to prove by clear and convincing evidence that abuse and neglect had occurred. In reaching this decision, the only credibility finding made by the court was that Dr. Shade's testimony was accorded "significant weight." Although the court found that the child reported to Dr. Shade that the boyfriend "shook" the child's penis, causing the child to cry, that in making this disclosure the child's "stuttering increased[,]" and that the "[c]hild was unable to describe any good touches from O[]'s daddy[,]" the court nonetheless seemingly discounted the disclosures because "[w]hile Dr. Shade concluded that something has happened with this child, it is unclear to this Court what that might be." Noting that "Dr. Shade attributed the child's anxiety as a cause of the speech issues the child was experiencing[,]" the court then found that "Dr. Shade is certain that there is something causing this child anxiety and concludes 'something has happened to this child[.]'" Inexplicably, the court also found that "[t]he only thing consistant [sic] between the CAC interview and Gail Shade's

6

testimony is that [the boyfriend] is mean," and that play therapy showed "the only actions of concern that were noted by Dr. Shade was [sic] spankings be[ing] given." As to the child's CAC interview, the court expressed "concern[] about drawing conclusions from [the child's] limited communication skills." According to the court, none of the CAC interviewer's lines of questioning "produced any conversation or statements that would be concerning for abuse" – a conclusion unquestionably at odds with the court's findings that the child disclosed during the CAC interview that "[the boyfriend] pulled his pants down"[;] that the boyfriend "touches him . . . seemingly pointing to all parts of the body"[;] that the boyfriend "used to touch [the child's] pee pee" when the child was in the shower; that the boyfriend had "touched" the child's "pee-pee" while the child was asleep; and that "O[]'s daddy came into my room and touched my butt and pee pee and told me I would not get any presents." Further, the court found that the petitioner was "the only person who offered testimony to the Court of any statements made by [the child] regarding sexual contact by O[]'s daddy," that "[n]o other witnesses reported hearing any similar type statements[,]" and that it was "unable to identify any specific disclosures of sexual abuse from the forensic interview" – again, findings that are unquestionably at odds with the court's findings in regard to the child's disclosures to Dr. Shade and to the CAC interviewer. The court then dismissed the matter based on the failure of the DHS to prove the allegations contained in the petition.[11]

On appeal from a final order in an abuse and neglect proceeding, this Court applies the following standard of review:

> "Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syl. Pt. 1, *In Interest of Tiffany Marie S.,* 196 W.Va. 223, 470 S.E.2d 177 (1996).

---

[11]Due to the child's clear exhibition of great anxiety, the circuit court ordered the parents to "immediately engage in coparenting classes and work with Dr. Shade on how to reintroduce [J.E.] to mother's home in an effort to resume the 50/50 shared custody that existed prior to these proceedings." Subsequently, the circuit court refused a motion to stay its order so that the court's decision could be appealed; however, by order entered on October 17, 2024, this Court stayed the circuit court's order.

Syl. Pt. 1, *In re Cecil T.,* 228 W. Va. 89, 717 S.E.2d 873 (2011).

The petitioner, joined by the DHS, argues that the circuit court erred in dismissing the abuse and neglect petition by finding that the DHS failed to prove by clear and convincing evidence the allegations of sexual abuse committed against the child by the boyfriend. The petitioner contends that the court not only ignored the evidence offered at the adjudicatory hearing but also made findings of fact that are inconsistent with the testimony presented during that hearing. Conversely, both the mother and her boyfriend argue that the court's findings were based on the evidence and are not clearly erroneous. They maintain that the DHS failed to prove its case by clear and convincing evidence, with the boyfriend arguing that the petitioner and the DHS are trying to "second guess the circuit court and substitute their judgment as to the key dispositive facts in this case."

In syllabus point three of *In re Christina L.,* 194 W. Va. 446, 460 S.E.2d 692 (1995), this Court held that:

> """W. Va. Code, 49-6-2(c) [1980], requires the State Department of Welfare [now the Department of Human Services], in a child abuse or neglect case, to prove 'conditions existing at the time of the filing of the petition . . . by clear and convincing proof.' The statute, however, does not specify any particular manner or mode of testimony or evidence by which the State Department of Welfare is obligated to meet this burden." Syllabus Point 1, *In Interest of S.C.,* 168 W. Va. 366, 284 S.E.2d 867 (1981).' Syllabus Point 1, *West Virginia Department of Human Services v. Peggy F.,* 184 W. Va. 60, 399 S.E.2d 460 (1990)." Syllabus Point 1, *In re Beth,* 192 W. Va. 656, 453 S.E.2d 639 (1994).

In this Court's review of the circuit court's findings of fact and conclusions of law, our "primary goal and focus must be on the health and welfare of the child[]." *W. Va. Dep't. of Health & Hum. Res. ex rel. Wright v. Scott C.,* 200 W. Va. 304, 309, 489 S.E.2d 281, 286 (1997); *see also* Syl. Pt. 3, *In re Katie S.,* 198 W. Va. 79, 479 S.E.2d 589 (1996) ("Although parents have substantial rights that must be protected, the primary goal in cases involving abuse and neglect, as in all family law matters, must be the health and welfare of the children."). Further, there is no precise qualitative or quantitative measure for determining whether testimony and/or evidence adduced by the DHS is sufficient to prove its case by clear and convincing evidence. *See In re Cristina L.,* 194 W. Va. at 448, 460 S.E.2d at 694, Syl. Pt. 3. "Clear and convincing evidence means that more than a mere scintilla of evidence has been presented to establish the veracity of the allegations of abuse and/or neglect, but it does not impose as exacting an evidentiary burden as criminal proceedings which generally require proof beyond a reasonable doubt." *In re A.M.,* 243 W. Va. 593, 598, 849 S.E.2d 371, 376 (2020).

As a threshold matter, we observe that the circuit court failed to make necessary credibility determinations in regard to all the witnesses that testified. In this regard, we are mindful that cases involving child victims of sexual abuse

generally pit the child's credibility against an adult's credibility and often times an adult family member's credibility. Since sexual abuse committed against children is such an aberrant behavior, most people find it easier to dismiss the child's testimony as being coached or made up or conclude that any touching of a child's private parts by an adult must have been by accident.

*State v. Edward Charles L.,* 183 W. Va. 641, 650, 398 S.E.2d 123, 132 (1990). We also "remain mindful that when young children reveal information about sexual abuse, they are not always completely consistent or quick to tell the full details of what happened—particularly when their abuser is an adult family member in the home[.]" *In re C.M,* 236 W. Va. 576, 585, 782 S.E.2d 763, 772 (2016).

In this case, the DHS offered the testimony of Dr. Shade, who was the only witness to whom the circuit court gave "significant weight[.]" She began treating the child before any disclosure of sexual abuse by the boyfriend. Dr. Shade testified that the child disclosed to her that the boyfriend "shook" the child's penis, stating that, "It hurt, and I--I--I--I cried." The child also disclosed to Dr. Shade that the boyfriend was mean, pulled down the child's pants and spanked him, got really mad at the child, spanked the child for lying even though his mommy told the boyfriend to stop, yelled at the child and spanked him for wanting to speak to his father, and told the child to come into his bedroom because the boyfriend had a prize for him. Dr. Shade described the child as shutting down when talking about things that made him afraid. Significantly, Dr. Shade testified that in her opinion the child was not coached and that "it does appear to be something *sexually inappropriate* was happening" to the child; yet the circuit court in recounting this evidence omitted this critical language, quoting Dr. Shade as stating merely that "something has happened with this child." (Emphasis added). The court's omission of the words "sexually inappropriate" is unsupported by the evidence as it fails to convey Dr. Shade's entire opinion that the boyfriend's touching of the child was sexually inappropriate.[12] Further, the court's finding that "Dr. Shade attributed the child's anxiety as a cause of the speech issues the child was experiencing[,]" contradicts a later finding by the court that "Dr. Shade is certain that there is something causing this child anxiety and concludes 'something has happened to this child[.]'" In fact, Dr. Shade testified that the child had a speech delay and needed speech therapy – which the child was receiving and which had greatly improved his speech by the time the disclosures were made – but she never testified that the child's speech problems were the cause of the child's anxiety. Moreover, the child's disclosures to Dr. Shade about being smacked and spanked by the boyfriend – disclosures which were not found by the court to lack credibility – directly contradicted the testimony of both the mother and the boyfriend that only the mother disciplined the child. On

---

[12] Let there be no mistake: in Dr. Shade's opinion, something sexually inappropriate had happened to the child while in the mother's home. As indicated in September, 2024, status updates filed with the Court by the guardian ad litem, the petitioner, and the DHS, at an August 27, 2024, hearing Dr. Shade stated that J.E. had continued to participate in counseling with her and that again, she could not recommend that the child resume contact with the mother because "the child had disclosed sexual abuse by the mother's boyfriend" and the therapist "believe[d] that sexual abuse did occur in the mother's home."

this issue, Dr. Shade, the only witness whose testimony was accorded "significant weight" by the court, also directly contradicted the testimony of the mother and the boyfriend when she recounted that the mother told her the boyfriend did all the discipline in the home.

Additionally, the circuit court's finding that it was "unable to identify any specific disclosures of sexual abuse from the forensic interview" simply ignored critical evidence produced by the DHS, the petitioner, and Dr. Shade. In J.E.'s CAC interview he disclosed that the boyfriend touched his butt, legs, and "pee-pee" multiple times, including once when the child was in the shower and another time when he was in his room with the door shut. In his disclosures to the petitioner and his wife, and to Dr. Shade, J.E. made other specific and consistent allegations of sexual contact on the part of the boyfriend, all of which evidence was entirely overlooked by the court in its order. Thus, the court's finding that the petitioner was "the only person who offered testimony to the Court of any statements made by [the child] regarding sexual contact by O[]'s daddy" is unsupported by the weight of the evidence to the contrary. Moreover, absent any findings that J.E.'s disclosures were not credible, we previously have stated that "[s]exual abuse may be proven solely with the victim's testimony, even if that testimony is uncorroborated." *In re K.P.,* 235 W. Va. 221, 230, 772 S.E.2d 914, 923 (2015).

The mother testified that she did not believe that her boyfriend had sexually molested the child. She did not think her child was lying, but she needed to "add context behind" her child's disclosures, stating that she actually told her child to "shake his penis" when going to the bathroom, that her boyfriend was *never* alone with the child "to have the opportunity to tell him or to shake a penis[,]" and that her child had problems expressing situations, using words that didn't belong. The circuit court failed to reconcile this testimony with that of Dr. Shade, who testified that the mother stated during a counseling session that the child was not telling the truth and was "making all these things up."

The boyfriend also denied the allegations, although it will be recalled that he initially asserted his Fifth Amendment rights.[13] Significantly, he testified that while he disciplined his other children, he did not discipline J.R. – all of which was, again, inconsistent with the testimony of Dr. Shade, the one witness whose testimony was given "significant weight" by the circuit court.[14] He also stated that he had never threatened or struck the mother, stating that he was almost never at home due to his work schedule. In this regard, however, although the abuse and neglect petition contained allegations of domestic violence in the presence of J.E., the court failed to make any findings with respect to this issue.

---

[13] *See W. Va. Dep't of Health & Hum. Res. ex rel. Wright,* 197 W. Va. at 492, 475 S.E.2d at 868, Syl. Pt. 2 ("Because the purpose of an abuse and neglect proceeding is remedial, where the parent or guardian fails to respond to probative evidence offered against him/her during the course of an abuse and neglect proceeding, a lower court may properly consider that individual's silence as affirmative evidence of that individual's culpability."). The circuit court did not make any assessment as to the boyfriend's initial silence and failure to respond to the evidence.

[14] Dr. Shade testified the mother told her that the boyfriend "does all of the discipline at her home[.] . . ."

10

In light of the evidence presented, the inconsistent and irreconcilable findings made by the circuit court, and the circuit court's failure to make credibility determinations that might explain those findings, we are left with the definite and firm conviction that the court erred in its dismissal of the abuse and neglect petition and in its failure to adjudicate the mother for failing to protect her child and the boyfriend for sexual abuse of the child. *See In re Cecil T.,* 228 W. Va. at 91, 717 S.E.2d at 875, Syl. Pt. 1, in part ("A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.").

Based on the foregoing, we vacate the circuit court's June 29, 2924, "Adjudication Order Dismissing Petition" and remand this case to the court for entry of an adjudicatory order consistent with this opinion, and for post-adjudicatory proceedings and disposition.

Vacated;
Remanded with Instructions.

**ISSUED:** May 14, 2025

**CONCURRED IN BY:**

Chief Justice William R. Wooton
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice C. Haley Bunn

**DISSENTING BY:**

Justice Charles S. Trump IV

TRUMP, Justice, dissenting:

I respectfully dissent from the majority's decision in this case.

The petitioner Q.E. is the father of the child J.E., and the Respondent J.R. is J.E.'s mother. J.E. was born in 2018, and at the time the petition for abuse and neglect was filed in the circuit court in this case (March 25, 2024), J.E. was five years old.

It is not clear from the record before us when Q.E. and J.R. split up or when their relationship that produced J.E. ended. What is clear is that there was a domestic relations action between Q.E. and J.R. in the Family Court of Berkeley County, West Virginia, that was commenced in 2022.[1]

---

[1] The appendix record before us in this case contains some limited documents from Case No. 22-D-245 in the Family Court of Berkeley County, which case was styled as *In Re: The child of J.R. and Q.E.* (the "family court case").

11

The record establishes that at the time of the filing of the petition for abuse and neglect, neither the father Q.E. nor the mother J.R. was living in Berkeley County, as one or both of them had apparently once lived. Just prior to the filing of the petition, the mother J.R. was living in Frederick County, Virginia, in a household with (1) J.E., (2) her boyfriend, the respondent W.Z., and (3) two younger children that J.R. and W.Z. have together, O.Z. and B.Z. [2]

During this same period, the father Q.E. was living in Jefferson County, West Virginia, with his wife H.E.[3] J.E. was also part of his father's household. As discussed above, because the complete record from the family court case is not before us, it is unclear as to what J.E.'s specific living arrangements were up until the filing of the petition in this case. It can be gleaned from the testimony and record in this case that J.E. was primarily in the custody of his mother, J.R., for some period of time after his birth. At some point in the family court case, however, the father Q.E. apparently sought a 50-50 allocation of custody of J.E. Because the parties were having difficulty agreeing upon questions of custody and where J.E. should attend school, the family court made a referral to a therapist, Dr. Gail Shade, who assisted the parties in resolving these issues. The record quite clearly establishes that the parties' litigation in family court was contentious.

The record also establishes that J.R. has been a stay-at-home mother, caring for her two younger children, B.Z. and O.Z., as well as J.E. before his removal. The undisputed testimony was that she was with the children constantly and that her boyfriend, the respondent W.Z., was seldom home due to his work schedule.

What is also clear from the record is that J.E. wanted his parents to be together. Both parents acknowledged that J.E. had told them that. What is also uncontroverted is that J.E. never made any disclosure or report to his mother that the respondent W.Z. had ever touched him sexually or inappropriately.

The record includes a recording of a conversation between the father Q.E. and the mother J.R. in which Q.E. told J.R. that J.E. said he had been "hurt" by W.Z. When the mother J.R. asked J.E. about it, he told her that he was referring to the fact that W.Z.'s beard scratched his face when he kissed him goodnight. Once J.R. addressed this with W.Z., he stopped kissing J.E. goodnight. J.R. testified that J.E. never reported any inappropriate or sexual touching to her.

Because of the involvement of the therapist, Dr. Shade, who had been involved with helping the family establish a parenting plan, there is a small window into what was going on with J.E. and the family dynamics prior to the allegations of abuse that were made in the initial days of 2024. For instance, the record reveals that on March 5, 2024, the DHS's child protective services worker (CPSW) Tonya McClure interviewed Dr. Shade and touched upon Dr. Shade's communications and interactions with J.E. CPSW McClure's case notes memorializing that contact indicated that on July 26, 2023, J.E. told Dr. Shade that "'[W.Z.] was mean' without a real

---

[2] The children O.Z. and B.Z. were dismissed from this case because the courts of West Virginia have no jurisdiction over them.

[3] H.E. is not a party to this case.

reason why." Her case notes indicate Dr. Shade was aware that "the mother and father were not in agreement where [J.E.] should go to school."[4] CPSW McClure recounted in a March 6, 2024, case note that on November 6, 2023, during a session with Dr. Shade, J.E. stated that "[W.Z.] was super mad at me and spanked me. Mommy told him to stop." Dr. Shade reported that J.E. then said, "I still like [W.Z.] even if he spanks me." Notably, there is nothing either in Dr. Shade's notes or the case notes of CPSW McClure from the fall of 2023 memorializing any sort of sexual contact or misconduct by W.Z.

On January 3, 2024, the father Q.E. filed a "Motion for Ex Parte Relief" in the parties' family court case, seeking sole physical custody of J.E. and the suspension of any visitation between the child and his mother. This motion was based on disclosures J.E. allegedly made to the father. A referral was made to CPS, and DHS arranged for a Child Advocacy Center ("CAC") interview of J.E., which occurred on January 29, 2024.

The video recording of the CAC interview is part of the record before this Court. Some of what J.E. had apparently said to Dr. Shade in late 2023 was repeated in the CAC interview—that W.Z. got "super mad" and put J.E. in a corner. It was only through extensive leading and highly suggestive questioning, however, that J.E. was coaxed to say that W.Z. touched the child's "pee-pee" while he was in the shower or while he was sleeping. Specifically, the video recording reveals that when shown an anatomical drawing and asked by the interviewer where the respondent W.Z. touched him on his body, the child responded by pointing to and identifying *numerous* body parts, including his "pee pee" and "butt." From there, the interviewer proceeded to ask highly suggestive questions about what the respondent W.Z. touched his "pee pee" with and where (several of which elicited answers such as "Play Doh"[5] and "a toy"), eventually leading to the child's purported "disclosure" that W.Z. touched him in "the shower" and while he was "sleeping."

The DHS filed the abuse and neglect petition in March, 2024. That petition alleges, inter alia, that the mother's boyfriend W.Z. had sexually abused J.E., and further that the mother J.R. "abused and neglected" J.E. by "knowingly allow[ing] another to commit sexual abuse" upon the child and "fail[ing] to protect" the child from harm.

The circuit court conducted the adjudicatory hearing over two days, on May 23, 2024, and June 21, 2024. At the conclusion of the adjudicatory hearing, the circuit court entered an order dismissing the petition, finding that the DHS had failed to prove by clear and convincing evidence that abuse and neglect had occurred. It is from this order of the circuit court that the father Q.E. has filed this appeal.

West Virginia Code § 49-4-601 requires that in an abuse and neglect case, the DHS must prove abuse or neglect by "clear and convincing evidence." *In the interest of S.C.*, 168 W. Va. 166, 284 S.E.2d 267 (1981). This Court has explained that "'clear and convincing" is the measure or degree of proof that will produce in the mind of the factfinder a firm belief or conviction as to

---

[4] J.E. now attends school in Jefferson County.

[5] During the interview and as they talked, the interviewer and the child were playing with Play Doh.

13

the allegations sought to be established. *In re C.M.*, 236 W. Va. 576, 583, 782 S.E.2d 763, 770 (2016) (quoting *Brown v. Gobble*, 196 W. Va. 559, 564, 474 S.E.2d 489, 494 (1996)).

After the DHS presents its evidence in an abuse and neglect case, the circuit court must "make findings of fact and conclusions of law as to whether the child is abused or neglected and whether the respondent is an abusing or neglecting parent." W. Va. Code § 49-4-601(i). *See also* W. Va. R. P. Child Abuse & Neglect Proc. 27 ("At the conclusion of the adjudicatory hearing, the court shall make findings of fact and conclusions of law, in writing or on the record, as to whether the child is abused and/or neglected in accordance with W. Va. Code § 49-4-601(i)."). The circuit court's findings must demonstrate that the DHS has met its burden of proving abuse or neglect by clear and convincing evidence to exercise jurisdiction over the matter. *See In re C.L.*, 249 W. Va. 95, 102, 894 S.E.2d 877, 884 (2023) ("At the adjudicatory hearing, to have jurisdiction over an abuse and neglect case, the circuit court must find *by clear and convincing evidence* that the children named in the petition are abused or neglected based upon conditions that existed at the time of filing." (emphasis added)).

After hearing all of the evidence that the DHS and the father Q.E. introduced in this case, the circuit court concluded that the evidence failed to meet the requisite standard of proof by clear and convincing evidence. I cannot disagree with the circuit court's judgment, and I certainly see no clear error in the circuit court's decision.

The record indicates that J.E.'s mother and father were no longer together not long after J.E.'s birth. Both had moved into new relationships. Q.E. and J.R. were embroiled in litigation in family court regarding the allocation of custody of J.E., and it was sufficiently contentious that the family court referred them to a therapist in an effort to get them to agree to the terms of a parenting plan.

What was presented to the circuit court below were some hearsay statements allegedly made by the child J.E. to other persons (his father, Q.E., and his therapist, Dr. Shade)[6] and during

---

[6] Dr. Shade's testimony that she believed J.E. was touched inappropriately, that "it does appear that something sexually inappropriate was happening," and that "the person he continues to accuse of that is" the respondent W.Z. was inadmissible. This Court has held:

> Expert psychological testimony is permissible in cases involving incidents of child sexual abuse and an expert may state an opinion as to whether the child comports with the psychological and behavioral profile of a child sexual abuse victim, and may offer an opinion based on objective findings that the child has been sexually abused. *Such an expert may not give an opinion as to whether he personally believes the child, nor an opinion as to whether the sexual assault was committed by the defendant, as these would improperly and prejudicially invade the province of the jury.*

a CAC interview that was conducted in a highly suggestive and leading fashion. These hearsay statements lacked specificity sufficient to convince the lower court that J.E. was an abused child and that the respondent W.Z. had abused him.  These hearsay statements were uncorroborated by any other evidence presented.

The majority opinion, as well as the father Q.E. and the guardian ad litem, rely on the principle that "a conviction for any sexual offense may be obtained on the uncorroborated testimony of the victim, unless such testimony is inherently incredible." Syl. Pt. 5, *State v. Beck*, 167 W. Va. 830, 286 S.E.2d 234 (1981). While this is indeed a correct statement of our law, it is wholly inapplicable to this case because there was no testimony from the child, J.E. Rather, there were only conflicting and inconsistent hearsay statements that were repeated by other people and questionable statements by J.E. in response to leading questions by the CAC interviewer.

I believe that our decision must be rendered based upon our long-standing and well-established standard of review: "On appeal from a final order in an abuse and neglect proceeding, this Court reviews the circuit court's findings of fact for clear error and its conclusions of law de novo." Syl. Pt. 1, *In re Cecil T*., 228 W. Va. 89, 717 S.E.2d 873 (2011).

In this case, the circuit court discharged its responsibility to weigh the evidence that was presented to it. Having reviewed the entire record before us, I do not see any clear error by the circuit court in its determination that the evidence presented fell short of the standard of clear and convincing proof.

In my view, the majority has exceeded the bounds of its appellate responsibilities and our long-standing precedent by improperly supplanting the circuit court's reasonable view of the evidence with its own. I believe that the circuit court's evaluation of the credibility of the witnesses and evidence is—as it always has been—entitled to deference considering its primary role as fact-finder.

In scores of abuse and neglect cases, this Court has declared that questions concerning the credibility of witnesses, including that of the victim, are for the factfinder and must be accorded deference. *Francis v. Bryson,* 217 W. Va. 432, 436, 618 S.E.2d 441, 445 (2005) ("The lower court heard the evidence presented by the opposing parties in the present case and was in a position to make credibility determinations that must be accorded deference."). We have explained that, as a reviewing court, this Court, unlike the trial court or jury, lacks the benefit of "observ[ing] the demeanor of the witnesses and other nuances of a trial that a record simply cannot convey." *Gum v. Dudley*, 202 W. Va. 477, 484, 505 S.E.2d 391, 398 (1997). Stated another way, "[t]he critical nature of unreviewable intangibles justify the deferential approach we accord findings by a circuit court." *State ex rel. Diva P. v. Kaufman*, 200 W. Va. 555, 562, 490 S.E.2d 642, 649 (1997), *superseded by statute as stated in State ex rel. S.W. v. Wilson*, 243 W. Va. 515, 845 S.E.2d 290 (2020); *State v. Guthrie*, 194 W. Va. 657, 669, n.9, 461 S.E.2d 163, 175 n.9 (1995) ("An appellate

Syl. Pt. 7, *State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990). (Emphasis added).  Despite the respondents' failure to object to this testimony, I believe the circuit court, as fact finder, correctly viewed it as violative of the parameters set by *Edward Charles L.* and, thus, did not afford it any weight in its decision in this case.

court may not decide the credibility of witnesses or weigh evidence as that is the exclusive function and task of the trier of fact."); *see also Mulugeta v. Misailidis*, 239 W. Va. 404, 408-09, 801 S.E.2d 282, 286-87 (2017) ("It is within the sole province of the family court, as fact-finder, to decide issues of credibility, and this Court will not disturb those determinations."); Syl. Pt. 2, in part, *Faris v. Harry Green Chevrolet, Inc.,* 212 W.Va. 386, 572 S.E.2d 909 (2002) ("It is the peculiar and exclusive province of the jury to weigh the evidence and to resolve questions of fact when the testimony of witnesses regarding them is conflicting[.]" (quotations and citation omitted)).Simply put, "[a] reviewing court cannot assess witness credibility through a record. The trier of fact is uniquely situated to make such determinations and this Court is not in a position to, and [should] not, second guess such determinations." *Michael D.C. v. Wanda L.C.*, 201 W. Va. 381, 388, 497 S.E.2d 531, 538 (1997).

As the trier of fact, the circuit court carefully evaluated the evidence presented at the adjudicatory hearing from the child's father and Dr. Shade, the child's therapist, concerning the child's disclosures to them of alleged sexual abuse by the respondent W.Z. *See State v. Edward Charles L.*, 183 W. Va. 641, 656, 398 S.E.2d 123, 138 (1990) (recognizing "what legal writers have described as the four dangers of hearsay: misperception, faulty narration, inaccurate memory, and insincerity" (citation omitted)). The circuit court also assessed the child's recorded CAC interview described above. From my review of this evidence—specifically, the child's even demeanor and casual responses to the interviewer's improper leading questions—it was highly likely that the circuit court did not find the child's "disclosure" to be trustworthy. Moreover, the record before this Court also includes evidence of disclosures and statements by the five-year-old child, J.E., that are unsubstantiated—i.e. "that the cops had come to his house," and that there were monsters under the bed.

Balancing the scales against these hearsay statements is the sworn testimony of W.Z. that he has never made any sexually inappropriate contact with J.E., and the testimony of J.E.'s mother, J.R., who, as a stay-at-home mom, was with J.E. and her other children virtually every minute of every day, that she saw no evidence of any such behavior, and that her child never made any report of that kind to her.

It bears repeating that the circuit court was charged with evaluating the reliability of the evidence, including all aspects of the CAC interview and, ultimately, with determining whether this evidence provided clear and convincing proof of sexual abuse by the respondent W.Z. and a resulting failure to protect by the mother J.R. On appeal, this Court "may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety. Syl. Pt. 1, in part, *In Int. of Tiffany Marie S.*, 196 W. Va. 223, 470 S.E.2d 177 (1996). A finding by the circuit court that the evidence in this case was insufficient to adjudicate respondents for abuse and neglect should be treated no differently.

Accordingly, for the reasons stated above, I respectfully dissent. I would affirm the judgment of the circuit court.