**STATE OF WEST VIRGINIA**
**SUPREME COURT OF APPEALS**

*In re* **K.B.-R. and L.R.**

**No. 24-30** (Marshall County CC-25-2019-JA-55 and CC-25-2019-JA-56)

## MEMORANDUM DECISION

Petitioners herein, mother S.R. and the children's guardian ad litem,[1] appeal the Circuit Court of Marshall County's December 21, 2023, order declining to adjudicate Respondent Father of sexual abuse and dismissing the petition, arguing that the circuit court erred in finding the evidence was insufficient to establish sexual abuse and in immediately reinstating a shared parenting plan.[2] Upon our review, we determine that oral argument is unnecessary and that a memorandum decision affirming the circuit court's order is appropriate. *See* W. Va. R. App. P. 21.

### Facts and Procedural History

### Petition to Institute Abuse and Neglect Proceedings

In November of 2019, Petitioner Mother reported allegations of sexual abuse of the children to the Moundsville Police Department, alleging that Respondent Father perpetrated the abuse against L.R., then seven years old, and K.B.-R., then five years old. The allegations were prompted by Petitioner Mother's discovery of nude photos and videos of at least one of the children on a cell phone that Petitioner Mother provided to L.R. and that L.R. had recently taken with her to Respondent Father's home. Petitioner Mother informed law enforcement that Respondent

---

[1] Petitioner Mother appears by counsel Amy Pigg Shafer. Counsel Joseph J. Moses appears as the children's guardian ad litem and co-petitioner herein. The West Virginia Department of Human Services appears by counsel Attorney General John B. McCuskey and Assistant Attorney General Andrew T. Waight. Because a new Attorney General took office while this appeal was pending, his name has been substituted as counsel. Respondent Father appears by counsel Mark D. Panepinto.

Additionally, pursuant to West Virginia Code § 5F-2-1a, the agency formerly known as the West Virginia Department of Health and Human Resources was terminated. It is now three separate agencies—the Department of Health Facilities, the Department of Health, and the Department of Human Services. *See* W. Va. Code § 5F-1-2. For purposes of abuse and neglect appeals, the agency is now the Department of Human Services ("DHS").

[2] We use initials where necessary to protect the identities of those involved in this case. *See* W. Va. R. App. P. 40(e).

Father told the children to record the images and that there had been inappropriate sexual contact between Respondent Father and the children. However, the children "made no affirmations or separate statements regarding said allegations" to law enforcement at that time, despite being present. Additionally, Petitioner Mother told law enforcement that the children used terms such as "labia" and "vulva." In response to Petitioner Mother's allegations, law enforcement contacted the DHS, which began an investigation. Law enforcement also determined that the images were created within an approximate ten-minute-long window between 1:00 a.m. and 3:00 a.m. on November 21, 2019.

On December 4, 2019, both children underwent forensic interviews at Harmony House Children's Advocacy Center ("Harmony House"). Patrol Sergeant William Whitelatch with the Moundsville Police Department attended the interviews, which were conducted by Lisa Musilli. During her interview, L.R. was asked if she could promise to tell the truth and responded, "Maybe." L.R. then disclosed that Respondent Father "put his finger in her 'butt,'" described it as painful, and indicated that it happened "lots." L.R. further indicated that the most recent incident occurred when she was at Respondent Father's home while K.B.-R. was at school. L.R. was also clear that no one had ever touched her vaginal area or placed anything inside her vagina. However, L.R. was inconsistent about Respondent Father's involvement in the cell phone images, indicating at various points that he told her to create them and that she made them on her own. L.R. also stated that no one ever asked her for or sent pictures or videos of her with no clothes on and, when asked if Respondent Father took videos of her, "she referenced videos of daddy fixing cars with her." During K.B.-R.'s interview, when asked if she could tell the truth, she stated "I don't know. I don't want to." K.B.-R. also refused to answer a question as to whether anyone told her what to say or talk about during the interviews. She further stated that "she saw [Respondent Father] touch her sister . . . under her underwear," though when asked about the details of the alleged abuse later in the interview, she could not provide any and stated, "I forget." In regard to the nude images, K.B.-R. stated that L.R. "made her do it" and claimed that L.R. "had been making similar nude images of her 'every single day.'" K.B.-R. denied that any adult ever engaged in similar conduct. During the interviews, neither child disclosed seeing Respondent Father's penis or engaging in masturbation with him, despite direct questions, and both children denied having watched pornography. Based on the foregoing, the DHS filed a petition alleging sexual abuse by Respondent Father on December 10, 2019.

**Initial Adjudicatory Rulings and Subsequent Appeals**

Thereafter, the matter progressed to adjudicatory hearings in July and August 2020, and the circuit court declined to adjudicate the father of sexual abuse, dismissed the petition, and reinstated the parents' original custody arrangement. Petitioner Mother appealed the circuit court's August 21, 2020, order declining to adjudicate Respondent Father of sexual abuse, and we remanded the matter for the entry of a new adjudicatory order. *See In re K.B.-R.*, No. 20-0734, 2021 WL 983076, at *3 (W. Va. Mar. 16, 2021) (memorandum decision). Following the first remand, Petitioner Mother then appealed the circuit court's April 7, 2021, corrected adjudicatory order that again declined to adjudicate Respondent Father, and we remanded the matter for a second time with directions that the case be transferred to a new circuit court judge and that the judge appoint a new guardian ad litem for the children. *See In re K.B.-R.*, 246 W. Va. 682, 874 S.E.2d 794 (2022). While the appeals were pending, the children spent considerable time with

2

Respondent Father at his residence. In October 2020, L.R. reported to a court appointed special advocate and the DHS that she was happy with the equal parenting plan and to be spending time with Respondent Father. Approximately two weeks after the children were permitted to visit Respondent Father in the summer of 2020, new allegations were expressed to their therapist, Ms. Dean, that the paternal grandmother was touching one of the children's genitals while helping the children bathe. When a Child Protective Services ("CPS") worker interviewed the children away from Petitioner Mother and Ms. Dean, they reported nothing negative whatsoever about visits or their grandmother. The DHS discovered no evidence that supported the allegations.

## Remand and New Adjudication

Upon remand following the second appeal, the matter was transferred to a new judge and a new guardian ad litem was appointed. In November 2022, the children were taken to Cambridge, Ohio, for sexual assault nurse examiner ("SANE") examinations after allegations of additional sexual abuse during Halloween weekend 2022. L.R. made additional allegations of sexual abuse by Respondent Father, including that he "put . . . his penis in [her] vagina" and had been doing so for at least three years, while K.B.-R. made no allegations. In response to these new allegations, the children underwent forensic interviews at Harmony House a few days after the SANE examinations. L.R. again made additional allegations, including that Respondent Father "tried to put" his penis in her "underwear," while K.B.-R. did not. Shortly thereafter, the DHS moved to file an amended petition against Petitioner Mother for unnecessarily subjecting the children to SANE exams. Although the court granted the motion, no amended petition was ever filed.

The matter then came on for a series of adjudicatory hearings beginning on August 3, 2023. The court heard testimony from CPS worker Nething, therapist Dean, and Sgt. Whitelatch. Ms. Nething described the circumstances surrounding the DHS's investigation and filing of the petition. In 2019, Ms. Nething recommended that Petitioner Mother obtain SANE exams of the children, but Petitioner Mother indicated that the hospital told her a SANE nurse was not available. Ms. Nething instructed Petitioner Mother to continue attempting to obtain the examinations, but testified that Petitioner Mother did not obtain them "at that time." The record shows, however, that Petitioner Mother took L.R. for a gynecological exam approximately one month after the 2019 allegations were reported, with the examination results appearing normal and indicating no signs of sexual abuse. Ms. Nething also testified that the results of the children's 2022 SANE evaluations were normal, despite L.R.'s new allegation that Respondent Father had been having vaginal intercourse with her for approximately three years. As to the ultimate issue of whether Respondent Father sexually abused the children, Ms. Nething stated that her opinion was that no sexual abuse occurred. In fact, Ms. Nething agreed that "the evidence . . . is quite the contrary" in that it "shows these events to not even be possible" and that "the medical evidence is consistent with no sexual abuse." Ms. Nething also testified to prior referrals involving Respondent Father, including a lone substantiation related to housing conditions for which Respondent Father received services and ultimately corrected. According to the record, Petitioner Mother was responsible for numerous past unsubstantiated allegations against Respondent Father. Next, Ms. Dean testified regarding her treatment of the children over a period of approximately eighteen months totaling sixteen sessions. Ms. Dean confirmed that L.R. initially disclosed watching pornography with Respondent Father and that both children explained that they did not like being at Respondent Father's home because he touched them inappropriately, in addition to disclosures of other types of abuse. Finally, Sgt.

Whitelatch testified to his investigation, including his review of the images from L.R.'s phone. Sgt. Whitelatch did not observe anyone other than the children in the photos and saw no indication that anyone else, including Respondent Father, was holding the phone when the videos were captured. In fact, Sgt. Whitelatch indicated that there was no evidence Respondent Father was present when the images were recorded. Sgt. Whitelatch described the videos from L.R.'s phone, indicating that "[e]ach girl was videoing each other, I believe, and they were laying on the bed naked" while "laughing back and forth with each other." According to Sgt. Whitelatch, the videos demonstrated that the children did not use technical terms like "labia" or "vulva"; rather, they often used incorrect names to refer to specific body parts. Sgt. Whitelatch also testified that Respondent Father's phone revealed no inappropriate images. Having observed the children's Harmony House interviews, Sgt. Whitelatch testified to his recollection of the disclosures contained therein. Further, Sgt. Whitelatch addressed the fact that the children's school attendance records, which were later introduced into evidence, contradicted L.R.'s disclosure that one incident of abuse occurred when she was home and K.B.-R. was at school. He also testified to the four interviews that he conducted with Respondent Father in which Respondent Father denied the allegations against him and stated that, upon learning of the images on the phone, he deleted them and talked to the children about not taking those types of photos or videos. Sgt. Whitelatch's investigation concluded by excluding Respondent Father as a suspect with the prosecuting attorney electing not to proceed with charges, a decision that Sgt. Whitelatch was "on board with."

On August 4, 2023, the court heard testimony from Ms. Musilli and Remington Conaway, the interviewers that conducted the children's 2019 and 2022 Harmony House interviews, respectively. The recorded interviews and the interviewers' notes were admitted into evidence. During her testimony, Ms. Musilli testified that the children's ability to recount the details of their abuse was subject to their ages, developmental levels, and trauma that they experienced. In response to K.B.-R. stating that she did not want to tell the truth, Ms. Musilli explained that the child stated that she knew the difference between the truth and a lie and was able to identify each through examples. During Mr. Conaway's testimony, he explained that K.B.-R. made no allegations during her 2022 interview, but that age and contact with the abuser could cause a child not to disclose abuse in a second interview. He further discussed L.R.'s disclosures during the 2022 interview, including that Respondent Father digitally penetrated her as recently as two weeks prior.

On August 20, 2023, Ms. Dean returned to testify following technical difficulties during her remote testimony at the earlier hearing. The court admitted Ms. Dean's therapy notes into evidence. Ms. Dean clarified that she took steps to ensure that the children's disclosures were not fabricated and that it was not uncommon for children to disclose more details "as things went on." Ms. Dean testified at length about the children's disclosures, including disclosures from both children on multiple dates in early 2020 in which they described masturbating Respondent Father. Ms. Dean testified that the children's disclosures were "like a natural conversation" and that the children "didn't even really know that it was a big deal." In regard to the cessation of her treatment of the children, the record shows that therapy with Ms. Dean was terminated abruptly over what Ms. Dean described as a "clash of personalities" with Petitioner Mother in regard to Petitioner Mother "dictat[ing] . . . and controll[ing]" certain aspects of the children's treatment. The court also heard testimony from CPS worker Brittany Meadows, the new worker assigned to the case, regarding her understanding of the case history prior to her assignment and the DHS's attempts to

implement supervised visits with Respondent Father during the proceedings. The DHS then rested its case, after which Respondent Father moved to dismiss the petition, which motion was denied.

Respondent Father then presented the paternal grandmother, who testified to the parents' history together, including that Petitioner Mother prevented Respondent Father from visiting L.R. at the hospital when she was born and limited Respondent Father's parenting time following L.R.'s birth, although he was eventually able to increase his parenting time with the children through court proceedings. The grandmother also discussed Respondent Father's visits with the children that occurred at her home and explained that Respondent Father gave L.R. suppositories for constipation. The grandmother also addressed the allegations that she touched one of the children inappropriately during baths. According to the grandmother, she was cleared of any wrongdoing following an investigation. As to the latest allegations from November 2022, in which L.R. claimed additional abuse by Respondent Father at his home during visits with the children over Halloween weekend 2022, the grandmother testified that the children never went to Respondent Father's home that weekend. Various documents and recordings from that weekend were admitted as exhibits during her testimony, including photographs of the children during the visits and the family's itinerary for the weekend.

At a subsequent hearing on September 14, 2023, the court heard testimony from several witnesses, including Petitioner Mother, who denied fabricating the allegations against Respondent Father. Therapist Rebecca Ebeling, who took over the children's treatment after Ms. Dean, then testified to the new disclosures L.R. made in 2022 regarding Respondent Father's ongoing sexual abuse. According to Ms. Ebeling, L.R. stated that Respondent Father touched her private area more than fifteen times and that it occurred as recently as November 2022. Ms. Ebeling described the manner in which L.R. made the disclosure as "looking . . . to have a question and answer" with a therapist, as opposed to "spew[ing] out a story."

On September 15, 2023, the court heard testimony from several other witnesses, including the godparents of K.B.-R. The godmother testified to her belief that Petitioner Mother was manipulative and had told the godmother that she "was banking on [Respondent Father] killing himself when all these allegations came out." The godmother testified that Petitioner Mother "asked [her] to help plant evidence in [Respondent Father's] house so CPS would take the kids away from him." The godmother indicated that this happened approximately four years prior and reported that Petitioner Mother "said it would be easier with [Respondent Father] out of the picture." Next, Respondent Father testified about the history of his relationship with Petitioner Mother and denied all of the allegations against him. At the final adjudicatory hearing on October 2, 2023, Petitioner Mother presented several rebuttal witnesses and testified again to deny the godmother's claims of planting evidence.

**Adjudicatory Order**

Ultimately, the court entered an order on December 21, 2023, finding that there was insufficient evidence to adjudicate Respondent Father, dismissing the case, and reinstating the pre-petition parenting schedule. In reaching this determination, the court noted several factors, such as the children's lack of statements to law enforcement in 2019; Petitioner Mother's testimony that, upon giving the phone to L.R., she instructed the children not to take nude images or videos of

5

themselves; and Petitioner Mother's failure to immediately obtain SANE examinations in 2019. As to the children's specific disclosures, the court raised concerns over the children's answers to questions about being truthful during their 2019 Harmony House interviews and cited inconsistencies within the 2019 Harmony House interviews and across all of their disclosures. This included L.R.'s statements about whether Respondent Father instructed her to record the cell phone images; early denials of having seen the Respondent Father's penis or having engaged in masturbation with him, despite direct questions; denials of having watched pornography; school attendance records contradicting L.R.'s claim of sexual abuse occurring while she was home and K.B.-R. was at school; testimony and other evidence contradicting L.R.'s claims of sexual abuse over Halloween weekend 2022 at Respondent Father's home; medical evidence contradicting claims of repeated and extended vaginal intercourse; and K.B.-R.'s consistent denials to Ms. Ebeling that sexual abuse occurred over more than one year of treatment, which resulted in Ms. Ebeling removing the diagnosis of sexual abuse. In fact, the court concluded that the Halloween weekend 2022 allegations by L.R. "were demonstrably proven to be false," given L.R.'s lack of specificity; K.B.-R.'s lack of corroboration despite L.R.'s claims that the child was in the room when the abuse occurred; extensive evidence, including photographs, demonstrating that the children were not at Respondent Father's home during that time period; and L.R.'s disclosure that Petitioner Mother said the sexual abuse allegations against Respondent Father "would get him in jail."

The court also cited Petitioner Mother's history of allegations against Respondent Father, including having presented Ms. Dean with a twenty-four-page folder of allegations of her perceived past and present parenting faults of Respondent Father. The court noted that several of Petitioner Mother's prior CPS referrals were without merit or did not warrant investigation. The court also cited the fact that Petitioner Mother was a primary source of information for the children's therapists, including that she misrepresented to Ms. Ebeling that Respondent Father lost his rights to the children. The court further noted that Respondent Father's consent for treatment was required at one point, and Petitioner Mother misrepresented to him that the treatment was necessary due to the death of their great-grandmother in order to obtain his consent. The court found that "for many years [Petitioner Mother] has employed an almost methodical campaign against [Respondent Father] to minimize, if not completely eliminate, any relationship with his two daughters." This included a 2018 petition for a domestic violence protective order against Respondent Father seeking complete custody of the children which Petitioner Mother agreed to dismiss when the family court found it frivolous and threatened to assess fees and costs against her. The court also found credible the testimony from K.B.-R.'s godmother wherein she stated that Petitioner Mother tried to enlist her help to plant evidence in Respondent Father's home in order to take the children from him.

Based on the court's review, it concluded that "very little, if any, evidence in this case is 'concise, exclusive, lacking in confusion and with such weight that it produces a firm belief or conviction, without hesitation,' about the allegations." The court noted that Respondent Father put on exculpatory evidence, "some of which was not available at the first adjudication hearing and some which simply was not presented as Judge Hummel dismissed the case before [Respondent Father] put on his evidence." The court found that the evidence did not prove that Respondent Father abused or neglected the children in any manner. The court further found that "it is as likely that [Petitioner Mother] devised the Childrens' [sic] allegations as it is that [Respondent Father]

6

abused his daughters," which it concluded "logically precludes a firm belief or conviction" of abuse. Accordingly, the court dismissed the petition and immediately reinstated the previously implemented parenting plan imposed by the family court, finding that it was in the children's best interests.

## Standard of Review

On appeal from a final order in an abuse and neglect proceeding, this Court reviews the circuit court's findings of fact for clear error and its conclusions of law de novo. Syl. Pt. 1, *In re Cecil T.*, 228 W. Va. 89, 717 S.E.2d 873 (2011). Critically, a circuit court's "findings shall not be set aside by a reviewing court unless clearly erroneous," which we have explained means that, "although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id.* (quoting Syl. Pt. 1, *In re Tiffany Marie S.*, 196 W. Va. 223, 470 S.E.2d 177 (1996)). We have further directed, however, that "a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." *In re Cecil T.*, 228 W. Va. at 91, 717 S.E.2d at 875, Syl. Pt. 1 (quoting *In re Tiffany Marie S.*, 196 W. Va. at 225, 470 S.E.2d at 179, Syl. Pt. 1).

## Discussion

Before this Court, the petitioners raise two assignments of error, both attacking the circuit court's conclusion that the evidence did not establish, under a clear and convincing standard, that Respondent Father sexually abused the children and the court's dismissal of the DHS's petition. Petitioners are correct that the court's findings as to whether Respondent Father abused or neglected the children "must be . . . proven by clear and convincing evidence." W. Va. Code § 49-4-601(i); *see also* Syl. Pt. 3, *In re B.L.-1*, 251 W. Va. 92, 909 S.E.2d 127 (2024) ("W. Va. Code, [§ 49-4-601(i)], requires the State Department of [Human Services], in a child abuse or neglect case, to prove 'conditions existing at the time of the filing of the petition . . . by clear and convincing [evidence].'" (quoting Syl. Pt. 1, *In re S.C.*, 168 W. Va. 366, 284 S.E.2d 867 (1981))). In regard to this burden, we have explained that "'clear and convincing' is the measure or degree of proof that will produce in the mind of the factfinder a firm belief or conviction as to the allegations sought to be established." *In re F.S.*, 233 W. Va. 538, 546, 759 S.E.2d 769, 777 (2014) (quoting *Brown v. Gobble*, 196 W. Va. 559, 564, 474 S.E.2d 489, 494 (1996)). In advancing their arguments, the petitioners place extreme emphasis on the children's repeated disclosures of Respondent Father's alleged inappropriate conduct and note, correctly, that "[s]exual abuse may be proven solely with the victim's testimony, even if that testimony is uncorroborated." *In re K.P.*, 235 W. Va. 221, 230, 772 S.E.2d 914, 923 (2015) (citation omitted). What the petitioners fail to recognize, however, is that the children's disclosures contained critical discrepancies and were also, in some instances, completely contradicted by other evidence. For example, the circuit court highlighted instances where the children initially denied certain conduct when asked, only to later claim that such conduct occurred, and also noted K.B.-R.'s eventual denials that any sexual abuse had ever occurred, despite her earlier disclosures. Further, the children's disclosures were often incongruent, as K.B.-R. made several statements that directly conflicted with L.R.'s disclosures. Perhaps most importantly, the court found that some of L.R.'s disclosures were demonstrably false, given that evidence was introduced to establish that the circumstances of some of the alleged acts

7

could not have been possible. Simply put, the petitioners' reliance on our past holdings concerning the sufficiency of a victim's uncorroborated testimony does not entitle them to relief here, where evidence was introduced to contradict many of the children's disclosures.

Moreover, the petitioners fail to recognize that evidence contradicting—or even completely disproving—certain key portions of the children's disclosures also calls into question the credibility of the disclosures in their entirety. On appeal, the petitioners ask this Court to disregard this contradictory evidence in favor of certain evidence they have identified that was not specifically discredited. However, these arguments "display[] a fundamental misunderstanding of our role as a reviewing court. We review the circuit court's decision under the [applicable] deferential standards . . . , and do not reweigh the evidence or make credibility determinations." *In re D.S.*, -- W. Va. --, --, 914 S.E.2d 701, 707 (2025). As such, the petitioners cannot be entitled to any relief upon arguments that ask this Court to reweigh the evidence. Further, the circuit court made a number of credibility determinations in regard to the evidence at issue. These credibility determinations extend beyond just the veracity of the children's disclosures, as the circuit court found credible testimony from K.B.-R.'s godmother regarding Petitioner Mother's express desire to plant evidence in Respondent Father's home in order to deny him custody of the children. This determination was further bolstered by evidence of Petitioner Mother's repeated CPS referrals of Respondent Father upon allegations that were not substantiated and the dismissal of her "frivolous" petition for a domestic violence protective order against him. We decline to disturb those determinations on appeal. *See Michael D.C. v. Wanda L.C.*, 201 W. Va. 381, 388, 497 S.E.2d 531, 538 (1997) ("A reviewing court cannot assess witness credibility through a record. The trier of fact is uniquely situated to make such determinations and this Court is not in a position to, and will not, second guess such determinations."). "Stated another way, '[t]he critical nature of unreviewable intangibles justify the deferential approach we accord findings by a circuit court.'" *In re I.J.*, No. 23-353, 2024 WL 4789972, at *6 (W. Va. Nov. 14, 2024) (memorandum decision) (quoting *State ex rel. Diva P. v. Kaufman*, 200 W. Va. 555, 562, 490 S.E.2d 642, 649 (1997), *superseded by statute as stated in State ex rel. S.W. v. Wilson*, 243 W. Va. 515, 845 S.E.2d 290 (2020)).

In further attacking the court's weighing of the evidence and determinations of witness credibility, the petitioners assert that the circuit court held the children to a standard that was too exacting for their ages. We recognize that "children often have greater difficulty than adults in establishing precise dates of incidents of sexual abuse" for a variety of reasons. *In re C.M.*, 236 W. Va. 576, 585, 782 S.E.2d 763, 772 (2016) (quoting *State v. Edward Charles L.*, 183 W. Va. 641, 650, 398 S.E.2d 123, 132 (1990)). With these difficulties in mind, however, it is clear that the circuit court did not require the children to recall every allegation with extreme precision. Instead, the circuit court considered the many discrepancies noted above, both internal to the children's own disclosures and when compared to the other child's disclosures and additional evidence, and simply concluded that the disclosures lacked credibility, as evidenced by the court's ultimate decision regarding Respondent Father's adjudication. Again, we will not disturb this determination on appeal.

Ultimately, we conclude that the circuit court did not err in finding that the evidence was insufficient to establish that Respondent Father sexually abused the children. Specifically, the court concluded that, based on the evidence, it could not have a definite and firm conviction of the allegations against Respondent Father. *See In re F.S.*, 233 W. Va. at 546, 759 S.E.2d at 777

(requiring a "firm belief or conviction as to the allegations sought to be established" in order to satisfy the clear and convincing burden (quoting *Brown v. Gobble*, 196 W. Va. at 564, 474 S.E.2d at 494)). The petitioners, however, attack the circuit court's application of the clear and convincing standard, arguing that its finding that it was "as likely" that Respondent Father sexually abused the children as it was that the allegations were fabricated constituted an improper application of the burden of proof. We disagree. The circuit court's thorough and well-reasoned order demonstrates a plain and appropriate application of the clear and convincing burden, including the specific finding the petitioners challenge, which simply illustrates the circuit court's conclusion that a firm belief in the allegations was logically precluded. Based on the foregoing, we are not left with "the definite and firm conviction that a mistake has been committed," and, because "the circuit court's account of the evidence is plausible in light of the record viewed in its entirety," we must affirm. *In re Cecil T.*, 228 W. Va. at 91, 717 S.E.2d at 875, Syl. Pt. 1 (quoting *In re Tiffany Marie S.*, 196 W. Va. at 225, 470 S.E.2d at 179, Syl. Pt. 1).

Finally, the petitioners argue that the circuit court erred in immediately restoring the previous shared parenting plan, arguing that it should have, instead, imposed a gradual transition for the children back to Respondent Father's shared custody. The petitioners are correct that we have previously cautioned against "sudden and dramatic changes in [children's] permanent custodians" and have instructed that circuit courts should "provide, whenever possible, for a gradual transition period, especially where young children are involved." Syl. Pt. 3, in part, *James M. v. Maynard*, 185 W. Va. 648, 408 S.E.2d 400 (1991). With this in mind, however, we note that Respondent Father was granted visits with the children throughout the proceedings, although Petitioner Mother argues that he had not enjoyed visits in the months leading up to the final adjudicatory hearing. Regardless, our review of the record indicates that Respondent Father was in regular contact with the children such that, under the specific facts of this particular appeal, the need to gradually transition the children back into his shared custody was not strictly necessary. Indeed, it does not appear that the children were likely to undergo trauma by reverting to a shared parenting plan, given that they would still be in the shared custody of Petitioner Mother where they resided during the majority of the proceedings. Further, "the over-arching purpose of our abuse and neglect statutory construct continues to be the correction of conditions of abuse and neglect and the return, if reasonably possible, of the children to their homes." *In re K.V.*, No. 23-102, 2024 WL 2863166, at *7 (W. Va. June 6, 2024) (memorandum decision) (quoting *State ex rel. C.H. v. Faircloth*, 240 W. Va. 729, 741, 815 S.E.2d 540, 552 (2018)). Given the lack of adjudication as an unfit parent, Respondent Father had an inherent right to be reunified with the children. *See In re Antonio R.A.*, 228 W. Va. 380, 390, 719 S.E.2d 850, 860 (2011). Petitioner Mother argues that the credible evidence of sexual abuse should have weighed against returning the children to Respondent Father's custody, but, as set forth above, the circuit court concluded that no sexual abuse occurred. As such, we determine that the court did not err in returning the children to the parents' shared custody upon dismissal of the petition.

For the foregoing reasons, we find no error in the decision of the circuit court, and its December 21, 2023, order is hereby affirmed.

Affirmed.

**ISSUED**: June 26, 2025


**CONCURRED IN BY**:

Chief Justice William R. Wooton
Justice Elizabeth D. Walker
Justice C. Haley Bunn
Justice Charles S. Trump IV

**DISSENTING:**

Justice Tim Armstead

Armstead, Justice, dissenting:

  I dissent to the majority's resolution of this case. I would have set this case for oral argument to thoroughly address the error alleged in this appeal. Having reviewed the parties' briefs and the issues raised therein, I believe a formal opinion of this Court was warranted, not a memorandum decision. Accordingly, I respectfully dissent.